39 P.3d 961 (2002)
Juan RIOS and Juan Farias, individually and on behalf of all others similarly situated, Respondents,
v.
WASHINGTON DEPARTMENT OF LABOR AND INDUSTRIES and Gary Moore, in his official capacity of Director of the Washington Department of Labor and Industries, Petitioners.
No. 70294-2.
Supreme Court of Washington, En Banc.
February 7, 2002.
*963 Robert. Gibbs, Seattle, Chadbourne & Parke, David M. Raim, Tracey Laws, M. Katherine Montgomery, Washington, DC, amicus curiae.
Christine Gegoire, Atty. Gen., Elliott S. Furst, Asst., Olympia, for Petitioners.
Todd Dale True, Daniel Ford, John Matthew Geyman, Sean M. Phelan, Seattle, for Respondents.
*962 OWENS, J.
At issue in this case is whether the Court of Appeals properly concluded that the Washington Department of Labor and Industries (the Department) had violated a statutory duty to promulgate a rule requiring mandatory blood testing for agricultural pesticide handlers. Although the Court of Appeals acknowledged that differing standards of review applied to the Department's rulemaking in 1993 and its denial of rulemaking in 1997, it did not review the two challenges separately. We agree with the Department that the plaintiffs failed to show that the 1993 rule was arbitrary and capricious. However, we have determined that the Department's denial of the plaintiffs' 1997 request was arbitrary in light of the Department's post 1993 investigation, and we therefore conclude that the Department's failure to act was contrary to the requirements of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW.
The Court of Appeals decision is therefore affirmed in part and reversed in part. We remand this matter to the Department with our order to initiate rulemaking.

FACTS
The plaintiffs in this class action lawsuit are agricultural pesticide handlers, farm workers directly engaged in mixing, loading, and applying pesticides. Because exposure to pesticides containing organophosphate and carbamate compounds is known to inhibit levels of cholinesterase, a blood enzyme essential to the proper functioning of the nervous system,[1] the pesticide handlers asked the Department in 1986 and again in 1991 to adopt a mandatory blood testing program to monitor their cholinesterase levels. The Department initiated rulemaking and, in March 1993, adopted WAC 296-307-14520 (originally codified as WAC 296-306-40011 (1993)),[2] which recommends but does *964 not require a blood testing program for monitoring cholinesterase levels. Stephen M. Cant, the Department's "industrial hygiene program manager," "made the initial decision not to require mandatory cholinesterase monitoring, and the Assistant Director for WISHA and the Director for the Department accepted that recommendation." Clerk's Papers (CP) at 508, 516.
The pesticide handlers informed the Department that they intended to seek judicial review. In response, the Department set up a Technical Advisory Group (TAG) "to assist the Department ... in determining an appropriate response" and "to identify the essential components of a successful monitoring program in Washington State." CP at 273. The TAG, comprised of three health care professionals from the University of Washington, along with two representatives from the Department, completed a 20 page report in August 1995. See CP at 271-91. Although the heading to section II of the TAG report termed cholinesterase monitoring "the most well developed and feasible method among available worker monitoring approaches for cholinesterase-inhibitor exposure," the TAG "recommend[ed] the following" in its September 1995 cover letter to the report: "Cholinesterase monitoring on a voluntary basis for those working in occupations involved with handling cholinesterase-inhibiting pesticides within the specific trigger levels described in this document." CP at 274, 202. The TAG explained that, "[g]iven the current limitations of various resources vital for the implementation of some of the recommendations described in this document, we are not advising mandatory cholinesterase monitoring programs." CP at 202.
In letters dated June 19 and July 18, 1997, the pesticide handlers' counsel asked the Department to "state its intent to adopt a mandatory medical monitoring rule for pesticide handlers." CP at 492. Michael Silverstein, the Department's Assistant Director for industrial safety and health, responded by letter of August 29, 1997. Silverstein explained that "[t]he primary rationale for not making ChE [(cholinesterase)] monitoring mandatory at this time grows out of the technical limitations involved with ChE testing," CP at 215, but he also discussed the constraints placed on the Department by competing priorities and limited resources. While Silverstein concluded that the Department had correctly decided in 1993 to recommend nonmandatory cholinesterase monitoring and had properly adhered to the voluntary recommendations in light of the 1995 TAG report, he nevertheless recognized "that additional review of technical issues related to cholinesterase monitoring was warranted both in light of the Technical Advisory Group advice to this effect, and also in light of the Governor's Executive Order on Regulatory Improvement (EO 97-02)." CP at 493. Consequently, the Department included "the voluntary monitoring recommendations in the Rule Review Plan ... submitted to the Governor in August 1997." Id.
The pesticide handlers filed the present declaratory judgment action in October 1997 in Thurston County Superior Court. CP at 5-15. They stated causes of action for the Department's alleged violation of WISHA, RCW 49.17.050(4) and 49.17.240(2); the Washington Administrative Procedure Act (APA), RCW 34.05.570(4)(b) and 34.05.570(2)(c); the Washington Law Against Discrimination, RCW 49.60.030; article I, section 12 of the Washington State Constitution; and Title VI of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000d. In January 1998, the case was certified as a class action on behalf of "all persons who are or will be employed as pesticide handlers in the agriculture industry in Washington State." CP at 21. At a bench trial in June 1998, the trial court issued an oral ruling based on the oral argument of counsel, the testimony from witnesses, and "the rule-making file required by RCW 34.05.370, as well as all pleadings, briefs and evidence which were called to the Court's attention." CP at 2221. The trial court ruled against the pesticide handlers on all causes of action.
*965 This court denied the pesticide handlers' request for discretionary review and transferred the matter to the Court of Appeals. Division Two reversed, and we granted the Department's petition for review.

ISSUE
When the Department decided not to include mandatory cholinesterase monitoring in the agricultural pesticide regulations promulgated in 1993, and then rejected in 1997 the pesticide handlers' renewed request for rulemaking on such a program, did the Department violate its statutory duty under WISHA or otherwise act arbitrarily or capriciously?

ANALYSIS
Standard of Review. The pesticide handlers have challenged the validity of the 1993 rule,[3] as well as the Department's subsequent failure to initiate rulemaking in 1997. The two challenges are based on distinct provisions in the APA.
The APA provides that "[t]he validity of any rule may be determined upon petition for a declaratory judgment addressed to the superior court of Thurston county, when it appears that the rule, or its threatened application, interferes with or impairs or immediately threatens to interfere with or impair the legal rights or privileges of the petitioner." RCW 34.05.570(2)(b) (emphasis added). The APA places "[t]he burden of demonstrating the invalidity of agency action ... on the party asserting invalidity" and further provides that "[t]he validity of agency action shall be determined in accordance with the standards of review provided in this section, as applied to the agency action at the time it was taken." RCW 34.05.570(1)(a), (b). The following standard of review is applicable to the pesticide handlers' challenge to the Department's 1993 rule:
(c) In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious.

RCW 34.05.570(2)(c) (emphasis added).
Whereas the pesticide handlers' challenge of the 1993 rule falls under RCW 34.05.570(2), their challenge to the Department's 1997 denial of their rulemaking request comes under RCW 34.05.570(4), the subsection governing actions other than rules or orders: "A person whose rights are violated by an agency's failure to perform a duty that is required by law to be performed may file a petition for review pursuant to RCW 34.05.514, seeking an order pursuant to this subsection requiring performance." RCW 34.05.570(4)(b) (emphasis added). As with the challenge to the 1993 rule, the pesticide handlers bear the burden of demonstrating their entitlement to relief, and judicial review must be based on the standard prescribed in the APA. Here, the standard applicable to the Department's alleged "failure to perform" in 1997 is very similar to the standard of review governing the challenge to the 1993 rule:
(c) Relief for persons aggrieved by the performance of an agency action, including the exercise of discretion, or an action under (b) of this subsection [subsection (4)] can be granted only if the court determines that the action is:
(i) Unconstitutional;
(ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;

(iii) Arbitrary or capricious; or *966 (iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.
RCW 34.05.570(4)(c) (emphasis added).
Thus, in broadest terms, the APA's standards of judicial review require that we make two inquiries: first, whether the pesticide handlers met their burden of demonstrating that the 1993 rule was unconstitutional, exceeded the Department's statutory authority, was adopted without compliance with rulemaking procedures, or was arbitrary and capricious; and, second, whether the pesticide handlers met their burden of demonstrating that the Department's 1997 decision to forgo rulemaking was unconstitutional, outside the Department's statutory authority, arbitrary or capricious, or made by unauthorized persons.
Not all of the statutory standards apply to our review of the 1993 rule and the 1997 denial of rulemaking. Although the pesticide handlers claimed that the Department's 1993 rule violated state and federal constitutional provisions, exceeded the Department's statutory authority, and was arbitrary and capricious, the Court of Appeals declined to address the pesticide handlers' inadequately developed constitutional argument and focused exclusively on whether the 1993 rule was "invalid for failure to comply with WISHA requirements." Rios v. Dep't of Labor & Indus., 103 Wash.App. 126, 136, 5 P.3d 19 (2000). We conclude that we may declare the omission in the 1993 rule invalid only upon the pesticide handlers' demonstration that the omission of a mandatory requirement violated the Department's duty under WISHA or was otherwise arbitrary and capricious.
Regarding the Department's 1997 refusal to initiate the requested rulemaking, the pesticide handlers' complaint made no specific reference to the grounds for review set forth in RCW 34.05.570(4)(c)(i)-(iv). Focusing solely on option (ii), the Court of Appeals analyzed only whether the Department had failed to perform a duty required under WISHA. As with our review of the 1993 rule, we conclude that the pesticide handlers will be entitled to relief only if they demonstrate that the Department's failure to initiate rulemaking in 1997 violated a duty under WISHA or was otherwise arbitrary or capricious.
The Department's Duty under WISHA.
Given the applicable standards of review, our threshold task in reviewing both the 1993 rule and the 1997 refusal to initiate rulemaking is to define the nature of the Department's statutory duty under WISHA. Exercising its police power and respecting "the mandates of Article II, section 35 of the state Constitution," the Washington legislature enacted WISHA in 1973 "to create, maintain, continue, and enhance the industrial safety and health program of the state."[4] The statute provides that the "program shall equal or exceed the standards prescribed by the Occupational Safety and Health Act of 1970," (OSHA), 29 U.S.C. § 651. RCW 49.17.010 (emphasis added).
Pivotal in this case is the WISHA provision regarding safety and health standards for exposure to toxic agents:
[T]he director shall:
. . . .
(4) Provide for the promulgation of health and safety standards and the control of conditions in all work places concerning gases, vapors, dust, or other airborne particles, toxic materials, or harmful physical agents which shall set a standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life; any such standards shall require where appropriate the use of protective devices or equipment and for monitoring or measuring any such gases, vapors, dust, or other airborne particles, toxic materials, or *967 harmful physical agents.[[5]]
The statute is not well drafted. In skeletal form, it states that "the director shall ... [p]rovide for the promulgation of ... standards and the control of conditions ... which shall set a standard which most adequately assures ... that no employee will suffer material impairment of health." It is anybody's guess what the relative pronoun "which" refers to in the clause "which shall set a standard""promulgation," "standards," or "control of conditions." In contrast to the WISHA provision, the first sentence in the seminal OSHA provision virtually sings with clarity: "The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, ... that no employee will suffer material impairment of health." 29 U.S.C. § 655(b)(5).
As a preliminary step in our analysis of RCW 49.17.050(4), we must correct a distinction between the state and federal provisions that the pesticide handlers urged and that the Court of Appeals adopted. The pesticide handlers maintained that OSHA says "may" where WISHA says "shall" and that, consequently, the state provision curtails the director's discretion. But this position is based on a misleading distinction. The federal statute actually uses the permissive "may" in an introductory statement lacking in WISHA. Because OSHA gives the secretary a series of optional means for developing safety and health standards, Congress necessarily used "may" to introduce the eight subsections delineating those options: "The Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard in the following manner." 29 U.S.C. § 655(b) (emphasis added). From those eight subsections (the first of which, for example, permits the secretary to appoint an advisory committee), Washington adopted only subsections (5) and (7), which pertain to the requirements of the standards that are promulgated. See RCW 49.17.050(4), .240(2). We simply do not find the permissive "may" in the overarching OSHA framework pertinent to our analysis of RCW 49.17.050(4), which we have previously described as "mirroring" 29 U.S.C. § 655(b)(5). Aviation W. Corp. v. Dep't of Labor & Indus., 138 Wash.2d 413, 431, 980 P.2d 701 (1999).
In fact, other than the greater coherence in the federal provision, we can see no significant difference between RCW 49.17.050(4), which states that "the director shall ... [p] rovide for the promulgation of health and safety standards ... which shall set a standard," and 29 U.S.C. § 655(b)(5), which states that "[t]he Secretary, in promulgating standards ..., shall set the standard." (Emphasis added.) While it may not be entirely clear what our legislature intended when it said "shall provide for the promulgation of rather than "shall promulgate," the chosen language makes the director's duty not a duty to promulgate, but a duty to make promulgation possible, a duty to create an opportunity for such rulemaking. In sum, we decline to conclude that the director's rulemaking discretion under WISHA is more circumscribed than that of the Secretary under OSHA. And, in any case, the issue presented is not whether the Department breached the statutory command that the director "provide for the promulgation of" rules, but whether the Department, having committed its energies to regulating the exposure of agricultural workers to pesticides, met the statutory requirements for such regulation. What this case thus demands is our close consideration of the specific requirements set forth in RCW 49.17.050(4).
*968 We must determine whether the pesticide handlers have shown that the Department, in failing to require mandatory cholinesterase monitoring, failed to "set a standard [that] most adequately assure[d], to the extent feasible, on the basis of the best available evidence, that no employee [would] suffer material impairment of health."[6] The essence of the pesticide handlers' challenges to the 1993 rule and the 1997 denial of rulemaking is that the Department under regulated the significant risk of pesticide exposure more specifically, that the Department did not set the standard that regulated the risk "to the extent feasible." The definition of "feasible" in an underregulation challenge is an issue of first impression in this state.
In our relatively recent decision in Aviation West, we confronted an over regulation challenge under RCW 49.17.050(4). In that case, cigarette manufacturers and other affected companies contended that the Department's regulation of smoking in private workplaces had gone beyond the Department's statutory authority. Our primary focus in that overregulation case was RCW 49.17.020(7), the general definition of "safety and health standard": "The term `safety and health standard' means a standard which requires the adoption or use of one or more practices, means, methods, operations, or processes reasonably necessary or appropriate to provide safe or healthful employment and places of employment."[7]
To better understand not only the distinction between our review of overregulation and underregulation challenges but also the interplay between the general definition of a safety and health standard and the more specific requirements of a toxic exposure standard, we may find guidance in federal cases interpreting the mirror image OSHA provisions, although plainly we are not bound by such cases. Adkins v. Aluminum Co. of Am., 110 Wash.2d 128, 147, 750 P.2d 1257 (1988); Aviation W. Corp., 138 Wash.2d at 424, 980 P.2d 701.
Federal cases have focused on the phrase "to the extent feasible" in 29 U.S.C. § 655(b)(5), the OSHA precursor to RCW 49.17.050(4). In construing "feasible," the United States Supreme Court took as its starting point the dictionary definition "`capable of being done, executed, or effected.'" Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 508-09, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) [hereinafter ATMI] (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 831 (1976)); see also Aviation W. Corp., 138 Wash.2d at 433 n. 11, 980 P.2d 701 (quoting Indus. Union Dep't v. Am. Petroleum Inst., 448 U.S. 607, 719, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (Marshall, J., dissenting)). Although the ATMI court refused to make the feasibility assessment of § 655(b)(5) dependent upon a compulsory cost-benefit analysis, the court acknowledged that the legislative history of OSHA indicated that a "feasible" standard must nevertheless be one "capable of economic and technological accomplishment": "Congress was concerned that the Act might be thought to require achievement *969 of absolute safety, an impossible standard, and therefore insisted that health and safety goals be capable of economic and technological accomplishment." ATMI, 452 U.S. at 514, 101 S.Ct. 2478 (emphasis added); see also AFL CIO v. OSHA, 965 F.2d 962, 980 (11th Cir.1992) (stating that "[t]he Supreme Court has defined `feasibility' as `"capable of being done, executed, or effected,"` ... both technologically and economically"). While the ATMI court cautioned that the general definition of a safety and health standard in § 652(8), which suggests a cost-benefit analysis, should not nullify the feasibility requirement, the court recognized that the "reasonably necessary or appropriate" language in the general definition nevertheless "might... impose additional restraints" on the feasibility analysis:
[I]f the use of one respirator would achieve the same reduction in health risk as the use of five, the use of five respirators was "technologically and economically feasible," and OSHA thus insisted on the use of five, then the "reasonably necessary or appropriate" limitation might come into play as an additional restriction on OSHA to choose the one-respirator standard.
ATMI, 452 U.S. at 514 n. 32, 101 S.Ct. 2478. The ATMI court also recognized that "any standard that was not economically or technologically feasible would a fortiori not be `reasonably necessary or appropriate' under the Act." Id. at 513 n. 31, 101 S.Ct. 2478 (citing Indus. Union Dep't v. Hodgson, 499 F.2d 467, 478 (1974) ("Congress does not appear to have intended to protect employees by putting their employers out of business....")).
In sum, in light of the guidance provided in ATMI, we conclude that the phrase "to the extent feasible" in RCW 49.17.050(4) means "to the extent the standard is capable of being economically and technologically accomplished." Two points regarding economic feasibility warrant emphasis. First, in determining economic feasibility under WISHA, the director must consider the degree to which a standard will affect the regulated industry's "`competitive stability.'" ATMI, 452 U.S. at 530 n. 55, 101 S.Ct. 2478 (quoting United Steelworkers of Am. v. Marshall, 647 F.2d 1189, 1265 (D.C.Cir.1980)). This analysis of economic feasibility under RCW 49.17.050(4) must not be confused with the Department's exercise of discretion in prioritizing among the many areas that could potentially benefit from rulemaking. In other words, the economic feasibility analysis must focus on the effect of the particular toxic agent standard on the regulated industry, not on the inadequacy of the Department's fiscal resources for rulemaking.[8]
Second, the Department's analysis of economic feasibility cannot be limited by the distinction in the federal cases between cost-benefit analysis and cost effectiveness,[9] for our state's APA expressly requires a cost-benefit analysis.[10] We likewise embrace the principle of cost effectiveness and acknowledge here that the critical language in the general definition of safety and health standard"reasonably *970 necessary or appropriate"works in tandem with the economic feasibility analysis to set a limit on the adoption of feasible methods. RCW 49.17.020(7). Applying the respirator hypothetical from ATMI, we conclude that the director has a duty under RCW 49.17.050(4) to continue adding "respirators" so long as the additions are feasible, but only up to the point where additional ones are no longer necessary to protect against the worker's "material impairment of health." See ATMI, 452 U.S. at 513 n. 32, 101 S.Ct. 2478; Bldg. & Const. Trades Dep't v. Brock, 838 F.2d 1258, 1269 (D.C.Cir.1988) (concluding that "it is [the Secretary's] duty to keep adding measures so long as they afford benefit and are feasible"). In effect, to outstrip what is "reasonably necessary" is to go beyond "the extent feasible." Clearly, whether the Department has fulfilled its mandatory duty under WISHA will depend upon whether the Department has properly exercised its discretion in making the feasibility analysis.
Returning to the discussion of our previous decision in Aviation West, we note that our analysis in that overregulation challenge naturally focused on whether the regulation had been "reasonably necessary or appropriate," for there, the appellants had maintained that the Department engaged in overkill, promulgating, in effect, a "five-respirator" standard, one that exaggerated the statutorily defined risk to worker health. In contrast to the overregulation challenge, the pesticide handlers do not say that what was done was not "reasonably necessary or appropriate"; rather, they focus on RCW 49.17.050(4) and contend that the Department underestimated again, in our hypothetical termsthe number of "respirators" necessary to protect against the "material impairment of health." In the pesticide handlers' view, even with the enactment of the other agricultural pesticide regulations, a risk of "material impairment of health" remained. They contend that the addition of a monitoring program was feasiblethat is, capable of economic and technological accomplishmentand that the addition was necessary to achieve the statutorily mandated level of worker protection.
Review of the Department's 1993 Rule.
We must decide whether the Department violated its statutory duty under WISHA or otherwise acted arbitrarily and capriciously when it decided not to include mandatory cholinesterase monitoring in the agricultural pesticide regulations promulgated in 1993. As is evident from our analysis of WISHA, the narrower question here is whether the Department in its 1993 rulemaking added measures "to the extent feasible" to protect against the pesticide handlers' "material impairment of health." RCW 49.17.050(4).
Applicable to the Department's feasibility analysis is but one standard of reviewwhether its feasibility decision was "arbitrary and capricious."[11] We have explained that "[a]gency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances." Hillis v. Dep't of Ecology, 131 Wash.2d 373, 383, 932 P.2d 139 (1997). More specifically, "[w]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." Id. When reviewing in Aviation West whether the Department's WISHA regulation had been "reasonably necessary or appropriate," we defined our inquiry as "a question for the fact finder [i.e., the agency] to determine on a case-by-case basis, subject to only limited review by this court," and we repeated that "the standard is that `[t]he court must scrutinize the record to determine if the result was reached through a process of reason, not whether the result was itself reasonable in the judgment of the court."[12] Further, in *971 scrutinizing the record, we ask whether the decision "was rational at the time it was made." Aviation W. Corp., 138 Wash.2d at 427, 980 P.2d 701.
In 1993, Stephen M. Cant, the Department's industrial hygiene program manager, determined that a mandatory monitoring program "was not justified" in light of the Department's adoption of "extensive other mandatory requirements to protect pesticide workers." CP at 516. Those requirements included "personal protective clothing, respiratory protection, gloves, training, posting, first aid, emergency facilities, washing facilities, eye-wash requirements, and other provisions designed to protect workers." CP at 515. It was Cant's belief that, if the 1993 standards were "correctly followed, pesticide workers [would] be protected" and the necessity for cholinesterase monitoring would be "obviate[d]." Id. Cant also considered "technical and practical problems associated with the test" that "had not been resolved" and could be only with "an additional expenditure of resources."[13] In sum, Cant concluded that the 1993 package of regulations protected agricultural pesticide workers "to the extent [economically and technologically] feasible" and that "to layer a burdensome blood test on top of the comprehensive worker protection requirements in place" would have produced a standard that was not cost effective and thus not "reasonably necessary or appropriate." RCW 49.17.050(4); CP at 518; RCW 49.17.020(7).
The primary evidence on which Cant relied was from the Environmental Protection Agency (the EPA). The EPA, rather than OSHA, has responsibility for setting the standards for pesticide protection. In fact, the Department's 1993 package of pesticide regulations was "adapted from the final draft of EPA's then proposed pesticide work protection standards." CP at 513. While initially endorsing cholinesterase monitoring, the EPA ultimately concluded that too many implementation difficulties remained to permit inclusion of the requirement in its final rule. Cant considered the EPA's decision not to require cholinesterase monitoring and "read their comments on this issue in the Federal Register before deciding this issue." CP at 516. Cant likewise noted his reliance on "data from the Pesticide Incident Review and Tracking Panel created by the Legislature to compile data on pesticide exposures." CP at 518.

The pesticide handlers assert that the Department neglected the evidence derived from California's mandatory monitoring program. The only such program in the country, California's program was adopted in 1974 through its Department of Agriculture. A 1989 study of the California program, based on a 1985 worker survey, showed that "23 percent of the 542 handlers in the study had cholinesterase levels indicating overexposure." CP at 2125; see also CP at 277 (citing Richard G. Ames et al., Cholinesterase Depression Among Pesticide Applicators: Results from the 1985 California Medical Monitoring Program, 15 AM. J. INDUS. *972 MED. 143-50 (1989)). Cant acknowledged his familiarity with the California program prior to his 1993 decision, but he maintained that the existence of the California program did not ipso facto make such a program necessary in Washington: "[T]here is no justification in Washington State to support the notion that, because California did something, that somehow, whatever the `something' was should be adopted here." CP at 514. In his view, because states are different, there will be "variation in approaches to problem solving." CP at 514. Indeed, no other state labor department has a mandatory program, nor does an OSHA standard even exist, given the EPA's jurisdiction over such pesticide regulations. Moreover, while the results in the 1989 study were significant, what the pesticide handlers did not show was that a comparable exposure rate would occur in Washington after its implementation of the 1993 protective regulations.[14]
As we demonstrated in Aviation West, neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious. Aviation W. Corp., 138 Wash.2d at 429, 980 P.2d 701 (citing ATMI, 452 U.S. at 523, 101 S.Ct. 2478 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966))). In Aviation West, we concluded that the Department's fundamental reliance on the EPA report on environmental tobacco smoke met the "best available evidence" requirement of RCW 49.17.050(4). Aviation W. Corp., 138 Wash.2d at 427-29, 980 P.2d 701. Just as we could not declare the Department's action unreasoning in Aviation West, we cannot in the present case conclude that the Department's 1993 rulemaking decision was not "rational at the time it was made." Aviation W. Corp., 138 Wash.2d at 427, 980 P.2d 701. The Department based its determination that a mandatory cholinesterase program was unnecessary on the EPA's decision not to include such a program among its federal pesticide protections. In sum, the pesticide handlers have not met their burden of showing that the absence of a mandatory program in the 1993 pesticide regulations rendered the 1993 rule "arbitrary and capricious" under RCW 34.05.570(2)(c).
Review of the Department's 1997 Decision Not to Act. We review the Department's 1997 denial of the pesticide handlers' request under the standards set forth in RCW 34.05.570(4)(c). The pesticide handlers have the burden of showing that Silverstein's August 1997 decision was "[a]rbitrary or capricious" in light of the record at that time.[15]
The critical post-1993 evidence in the record is the August 1995 TAG report. The basic tenets of the report are that cholinesterase-inhibiting pesticides can materially harm workers, that medical monitoring by means of a simple blood test is "the most well developed and feasible method" for monitoring such exposure, and that the California program and the Washington nonmandatory guidelines provide a substantial model for a mandatory Washington rule. CP at 274.
The TAG report relies on significant post 1993 research. The report cites two 1995 articles supporting its straightforward observation that "[t]he surveillance system in California has succeeded in reducing the number *973 of work-related pesticide illnesses." CP at 272, 287; see also CP at 2088-89. According to the report, the TAG contacted the medical coordinator of the California program, a medical supervisor involved in the program, and "other organizations and individuals representing workers in California." CP at 281 82. The report addressed "[t]he difficulties" prompting the EPA to reverse its original decision to initiate a mandatory nationwide requirement, CP at 275, and the TAG also reviewed information from the World Health Organization and the National Institute on Safety and Health, as well as the annual reports from Washington's Pesticide Incident Reporting and Tracking panel (PIRT). See CP at 2091. The 1991-97 PIRT data showed that, of 279 reported pesticide incidents for which cholinesterase testing had been done, 43 workers (15 percent) had depressed cholinesterase levels. CP at 498. Also available to the TAG was a 1995 Washington study showing that 10 percent of workers who were tested had cholinesterase levels low enough to meet the California trigger levels. CP at 278.
The tenor of the TAG report is proactive. The TAG outlined the essential requirements of a mandatory monitoring program, the "resources required, and technical issues that must be addressed to ensure that these primary goals are accomplished and maintained." CP at 280-81; see also CP at 283-84. The TAG identified the ways in which the California model would have to be modified to meet the TAG's goals. Consistent with the report's description of its recommended monitoring program as "the most well developed and feasible method," the report does not conclude that the suggested modifications are not technologically or economically capable of accomplishment.
The Department can do little to parry the thrust of the TAG report. In explaining his 1997 decision not to go forward with the requested rulemaking, Michael Silverstein, the Department's Assistant Director for the WISHA Services Division, did not claim that a mandatory rule was not technologically or economically feasible. Rather, he admitted that "it might be possible to demonstrate feasibility for a cholinesterase monitoring program," but simply cautioned that it "[would] be a challenging and complex undertaking." CP at 502. Silverstein focused primarily on the Department's limited resources, noting in particular the budget and staff constraints in the rulemaking section of his division, and he stressed the importance of setting priorities for the allocation of scarce resources. In his view, "any substantial new rulemaking project would require new budget or the displacement of other agency activities," and he speculated that, because "regulation in the agricultural sector has been controversial and contentious," the Department "would need to prepare for this by securing additional technical and legal resources to develop and evaluate a voluminous record, and to prepare for likely litigation." CP at 494, 502. Surmising that it was "unlikely" that the Department would "have any capacity to do rulemaking for medical surveillance in the foreseeable future," Silverstein went on to observe that, should the Department "nevertheless ... choose a specific chemical exposure or group of workers for medical surveillance rulemaking, [the Department] would consider cholinesterase monitoring for farm workers as one of many possibilities." CP at 497. He emphasized that cholinesterase had no special claim by noting that "[t]here are literally hundreds of such chemicals to which millions of workers are exposed." Id.
Ordinarily, an agency is accorded wide discretion in deciding to forgo rulemaking in an area, and fiscal constraints may reasonably determine whether an agency takes action (and, if so, how). But an agency's allusion to fiscal considerations and prioritizing cannot be regarded as an unbeatable trump in the agency's hand; on review, a plaintiff has the opportunity to show that the agency's failure to act was "[a]rbitrary or capricious." RCW 34.05.570(4)(c)(iii); see Hillis, 131 Wash.2d at 390-91, 932 P.2d 139. This case presents an extraordinary circumstance: even though we recognize the Department's wide discretion in choosing and scheduling its rulemaking efforts, we conclude that the Department's denial of the pesticide handlers' 1997 request was arbitrary. At the time of their request in 1997, the pesticide handlers were not asking the *974 Department to embark on a new enterprisethey had not simply pulled from a hat the name of one dangerous workplace chemical among the hundreds. In fact, the Department had already made cholinesterase monitoring enough of a priority to draft the nonmandatory guidelines and to convene a team of experts "to identify the essential components of a successful monitoring program." CP at 273. And that report announced in its introductory summary that "[t]he TAG recommends cholinesterase monitoring for all occupations handling Class I or II organophosphate or carbamate pesticides."[16] Because the Department had already invested its resources in studying cholinesterase-inhibiting pesticides and because the report of its own team of technical experts had, in light of the most current research, deemed a monitoring program both necessary and doable, the Department's 1997 denial of the pesticide handlers' request was "unreasoning and taken without regard to the attending facts or circumstances." Hillis, 131 Wash.2d at 383, 932 P.2d 139. Consequently, in failing to act on the request for rulemaking, the Department violated RCW 49.17.050(4), the requirement that the Department "set a standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health."

CONCLUSION
Under RCW 34.05.574, a court reviewing agency action has an array of options: "the court may (a) affirm the agency action or (b) order an agency to take action required by law, order an agency to exercise discretion required by law, set aside agency action, enjoin or stay the agency action, remand the matter for further proceedings, or enter a declaratory judgment order." While we affirm the validity of the Department's 1993 rule, we conclude that the pesticide handlers met their burden of showing that the Department's 1997 denial of the pesticide handlers' request for rulemaking was unreasonable. We therefore order the Department to initiate rulemaking on a mandatory cholinesterase monitoring program for agricultural pesticide handlers.
We affirm in part, reverse in part, and remand to the Department for further proceedings consistent with this opinion.
SMITH, JOHNSON, IRELAND, BRIDGE and CHAMBERS, JJ., concur.
ALEXANDER, C.J. (concurring).
I fully subscribe to the conclusion Justice Owens has enunciated in the majority opinion to the effect that the pesticide handlers satisfied their burden of showing that the Department of Labor and Industries (L & I) unreasonably denied their 1997 request for rule making. In that regard, I agree with the majority that by virtue of its failure to promulgate mandatory rules for cholinesterase monitoring after it deemed cholinesterase monitoring both necessary and feasible, L & I violated the provisions of RCW 49.17.050(4) that require L & I to "set a standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health."
I write separately simply to indicate my disagreement with Justice Sanders's view that the situation before us is "on all fours with the one we faced in Hillis v. State, Department of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997)." Dissent at 983. In Hillis, the plaintiff filed a lawsuit against the Department of Ecology (DOE) to compel the processing of his application for groundwater rights. The record there showed that DOE was engaged in the ongoing task of processing those applications and did not dispute that it had a statutory duty to do so. Rather, it claimed that it had discretion to establish its own schedule for carrying out its duties. We agreed with DOE, notwithstanding a dissent authored by me, and concluded *975 that DOE had considerable discretion over the manner in which it carried out its statutory duties. In reaching that conclusion the majority held that it was not arbitrary or capricious for DOE to consider fiscal constraints in ordering priorities for processing applications for groundwater rights. Thus, our concern in Hillis focused on the amount of procedural discretion that DOE had over the manner in which it carried out its statutorily prescribed duties.
The fact that an agency has discretion over the manner in which it carries out its statutorily prescribed duties does not mean that the agency has the discretion to refuse to carry out those duties. L & I interprets RCW 49.17.050 in a way that supports its conclusion that it had discretion to decide whether or not to initiate rule making on mandatory cholinesterase monitoring for agricultural pesticide handlers. Such an interpretation of that statute is, in my view, contrary to the law because an agency does not have discretion to determine the scope or extent of its own authority. In re Elec. Lightwave, Inc., 123 Wash.2d 530, 540, 869 P.2d 1045 (1994). While, as I noted above, an agency has wide discretion as to the manner it carries out its duties, its discretion is limited to the terms of the statutory scheme that provides the agency its authority. Because the challenge in Hillis concerned the amount of procedural discretion an agency has when carrying out its statutorily prescribed duties, and did not concern discretion to determine the scope of the agency's authority, Hillis does not command us to reverse the Court of Appeals.
Accordingly, I concur with the majority opinion.
MADSEN, J. (dissenting).
The majority claims that this case presents an extraordinary circumstance justifying the conclusion that the Director of the Department of Labor and Industries acted arbitrarily in denying the pesticide handlers' 1997 request for a mandatory rule requiring blood testing of pesticide handlers' cholinesterase levels. If this case represents such extraordinary circumstance, then this court, itself, has set an extraordinary precedent that will result in courts directing that untold numbers of mandatory rules be promulgated by the Director, notwithstanding the Department's limited resources and funding, and notwithstanding the separation of powers doctrine.
I respectfully dissent because the majority opinion fails to accord due deference to the Director's decision, particularly where the decision not to adopt a mandatory rule rests to a large extent on availability of agency resources and funding, and the agency's decisions on priorities. It fails to heed the principle that substantial judicial deference is to be accorded agency views based heavily on factual matters which are complex, technical, and close to the heart of the agency's experience. It gives undue weight to an advisory report, while at the same time fails to give appropriate weight to aspects of that report that support the Director's decision. The majority's analysis provides a huge disincentive to agency's consideration of issues for possible rule making. If consideration of rule making will ultimately require rule making, an agency will think very carefully before investigating possible subjects of rule making. In the end, the majority has substituted its factual determinations and judgment for that of the agency. This the court should not do.

I.

Failure to Petition for Rule Making
Before turning to the heart of this case, i.e., whether the Director acted arbitrarily in declining to promulgate a mandatory rule, one significant procedural issue bears commentthe failure of the pesticide handlers to petition for rule making in 1997, as required by RCW 34.05.330(1), and as they were encouraged to do by the Department. Unfortunately, this issue is not addressed by the majority, and the Court of Appeals, which did address it, decided it wrongly. The majority's acceptance of the proposition that review is appropriate under RCW 34.05.570(4)(c) despite the pesticide handlers' failure to petition is bound to reverberate in future administrative law appeals, given the Court of Appeals published decision. Moreover, the failure to comply with the petition *976 requirement should preclude review in this case of the 1997 refusal to adopt a mandatory rule, ending this case.
RCW 34.05.330(1) provides that "[a]ny person may[1] petition an agency requesting the adoption, amendment, or repeal of any rule." Within 60 days, the agency must either (1) deny the petition in writing, stating the reasons for the denial and specifically addressing the concerns raised in the petition, and, if appropriate, stating alternative means by which the agency will address those concerns, or (2) initiate rule making. Id. Analogous federal cases are persuasive that the failure to petition for rule making precludes judicial review of the refusal to engage in rule making. The federal counterpart states that "each agency shall give an interested person the right to petition for the issuance... of a rule." 5 U.S.C. § 553(e) (1996). Under 5 U.S.C. § 555(e), the agency must provide "a brief statement of the grounds for denial." Am. Horse Prot. Ass'n v. Lyng, 812 F.2d 1, 4 (D.C.Cir.1987). Where a petition for rule making is properly filed, and the agency refuses to engage in rule making, review is then appropriate under 5 U.S.C. § 706, which describes the scope of review. See Am. Horse Prot., 812 F.2d at 4; Kappelmann v. Delta Air Lines, Inc., 539 F.2d 165, 172 & n. 22 (D.C.Cir.1976). However, where a petition is not filed, judicial review is generally precluded. See S. Hills Health Sys. v. Bowen, 864 F.2d 1084, 1095 (3d Cir.1988); Kappelmann, 539 F.2d at 171-73; N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P., 117 F.Supp.2d 211, 236 & n. 50 (N.D.N.Y.2000); Midwater Trawlers Co-op. v. Mosbacher, 727 F.Supp. 12, 15 (D.D.C. 1989); Hoffmann-La Roche, Inc. v. Harris, 484 F.Supp. 58, 60 (D.D.C.1979).[2] The doctrines of exhaustion and primary jurisdiction have been applied as the bases for courts to decline to review cases where plaintiffs have failed to petition for rule making under 5 U.S.C. § 553(e). See Brown v. Sec'y of Health & Human Servs., 46 F.3d 102, 113-15 (1st Cir.1995); Skubel v. Sullivan, 925 F.Supp. 930, 936 (D.Conn.1996).
I would hold that a petition under RCW 34.05.330(1) is a necessary predicate to seeking judicial review of an agency's refusal to engage in rule making. Among other things, compliance with the statute increases the likelihood that a more developed administrative record will likely exist, provides that the agency will state reasons for denying rule making, thus clarifying its particular policy reasons for denial, and will assure that the agency will state how it intends, where appropriate, to meet the petitioner's concerns, thus providing additional information as to the agency's refusal to engage in rule making. Thus, compliance with RCW 34.05.330 will in general greatly facilitate judicial review, see Brown, 46 F.3d at 114, and in particular will also help assure that a court does not unduly interfere in an agency's decision making. And, more fundamentally, it will give the agency the opportunity to address the petition for rule making in a structured fashion in the first place. The requirement of filing a petition for rule making is not onerous, and the benefits to be derived far outweigh any burden. Further, because the agency must respond within 60 days to a petition, the requirement does not unduly delay review of a denial.
*977 The Court of Appeals reasoned, however, that under RCW 34.05.534(1), the pesticide handlers were not required to petition for adoption of a rule. RCW 34.05.534(1) states that "[a] petitioner for judicial review of a rule need not have participated in the rulemaking proceeding upon which that rule is based, have petitioned for its amendment or repeal, have petitioned the joint administrative rules review committee for its review, or have appealed a petition for amendment or repeal to the governor." The Court of Appeals held that this provision applies in this case, and thus the pesticide handlers' failure to petition for rule making in 1997 did not preclude review of their request. However, by its plain terms, RCW 34.05.534(1) applies where the challenge is to a rule, or the amendment or repeal of a rule. It does not apply where the challenge is to the failure to engage in rule making. This conclusion is reinforced by the specific language used in RCW 34.05.330(1), which allows any person to petition for "adoption, amendment, or repeal" of any rule. RCW 34.05.534(1), in contrast, refers only to existing rules, and their amendment and repeal. The omission of any language relating to adoption of a rule indicates legislative intent that exhaustion is not excused where adoption of a rule is sought.
Here, the pesticide handlers have not exhausted their administrative remedies as required because they did not petition for rule making, see Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 866, 947 P.2d 1208 (1997), nor do they contend that they are excused from exhausting their administrative remedies.
Finally, on this procedural issue, I disagree with the Court of Appeals conclusion that RCW 34.05.570(4)(b) "trumps" the petition requirement of RCW 34.05.330(1). RCW 34.05.570 addresses the burden of proof and the standards of judicial review. Along with review of rules and agency orders in adjudicative proceedings, the statute provides for the method for seeking review of "other agency action," RCW 34.05.570(4), and states that "[a]ll agency action not reviewable under subsection (2) or (3) of this section shall be reviewed under this subsection," RCW 34.05.570(4)(a). Thus, where an agency has failed to perform a duty required by law, subsection (4)(b) directs that a petition for review may be filed in accordance with the procedures in RCW 34.05.514, states how and when the agency is to respond, and states that the court may hear evidence, pursuant to RCW 34.05.562, on material issues of fact. RCW 34.05.570(4)(b) does not, by its terms, preclude or excuse the filing of a petition for rule making where a challenge is the failure to promulgate a rule. Moreover, as explained, bypassing the petition process can severely handicap judicial review because the opportunity for a more complete record and a clear explanation of the reasons for denying rule making would also be bypassed. Finally, as also noted, the petition requirement is a predicate to review of denial of rule making in the federal system, but, if the petition is denied, then review proceeds according to the federal counterpart to RCW 34.05.570, 5 U.S.C. § 706.
This court should hold that judicial review of the failure to promulgate a mandatory blood testing rule in 1997 is precluded because the pesticide handlers did not petition for the adoption of a rule at that time as required under RCW 34.05.330(1).

II.

Whether the Director Must Promulgate a Mandatory Rule
With regard to the 1997 decision by the Director not to adopt a rule, the majority concludes that this case involves an extraordinary circumstance justifying this court in requiring the Director to promulgate a mandatory blood testing rule. In my view, this holding represents a serious encroachment by the judiciary into the responsibilities of the executive branch of government.
When reviewable, an agency decision not to adopt a rule is reviewable under RCW 34.05.570(4), as the majority says. See Hillis v. Dep't of Ecology, 131 Wash.2d 373, 393-94, 932 P.2d 139 (1997). The standard of review is whether the decision not to promulgate was arbitrary or capricious. "Agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances." Hillis, *978 131 Wash.2d at 383, 932 P.2d 139. "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." Id.
Federal courts have appropriately explained that the degree of deference to the agency under the arbitrary and capricious standard, where agency inaction is the refusal to adopt a rule, depends in part upon the reason that the agency declines to adopt the rule. For example, where the reason lies in the agency's construction of statute, i.e., a question of law, there is less reason for deference than in the case where the agency's decision not to regulate is based upon factors not inherently susceptible to judicial review, such as internal management considerations relating to budget or personnel, the agency's assessment of its own competence, or the weighing of competing policies in an extensive statutory scheme. Pub. Citizen v. Heckler, 653 F.Supp. 1229, 1239 (D.D.C.1986). The court in Maier v. United States Environmental Protection Agency, 114 F.3d 1032, 1040 (10th Cir.1997) noted that within the range of deference embodied in the "arbitrary and capricious" standard of review, an agency's refusal to initiate rule making is at the high end, adding that
[c]ourts are ill-equipped and poorly situated to address important reasons for agency inaction, such as the decision that "a problem is not sufficiently important to justify the allocation of significant scarce resources given the nature of the many other problems the agency is attempting to address." 1 KENNETH C. DAVIS & RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 6.9, at 280 (3d ed.1994).
Thus, federal courts have concluded that a refusal to adopt a rule should be overturned "only in the rarest and most compelling of circumstances ... primarily involv[ing] ... plain errors of law, suggesting that the agency has been blind to the source of its delegated power." Am. Horse Prot., 812 F.2d at 5 (citations and quotation marks omitted). This court should take the same approach. Unfortunately, the majority has not accorded the agency's decision the deference that is due.
Setting aside concerns about exhaustion requirements and separation of powers concerns, the majority's analysis under the arbitrary and capricious standard is highly questionable. The majority's analysis turns largely on its view of whether a health and safety standard on mandatory blood monitoring for pesticide handlers' cholinesterase levels is "feasible." Although not acknowledged by the majority, there is a significant question about whether the "to the extent feasible" language of RCW 49.17.050(4) even applies as the yardstick by which to measure the Director's decision not to adopt a mandatory blood testing rule. RCW 49.17.050(4) contains essentially two directives, first, that the Director shall
Provide for the promulgation of health and safety standards and the control of conditions in all work places concerning gases, vapors, dust, or other airborne particles, toxic materials, or harmful physical agents which shall set a standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity....
The second directive is that any "such standards shall require where appropriate ... monitoring or measuring any such gases, vapors, dust, or other airborne particles, toxic materials, or harmful physical agents." RCW 49.17.050(4) (emphasis added). A related statute also uses the term "where appropriate" when referring specifically to medical monitoring. RCW 49.17.240(2) states that ["w] here appropriate, such [safety and health standards] ... shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be reasonably necessary for the protection of employees," and "[i]n addition, where appropriate, any such rule shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure." (Emphasis added.)
*979 Thus, there is compelling reason to conclude that the proper measure of medical monitoring required is whether it is "appropriate," not whether it is "feasible." This does not mean that Washington workers would receive less protection than required by law. Anytime a protective standard is adopted by the federal Occupational Safety and Health Administration (OSHA), RCW 49.17.010 requires that this state program "shall equal or exceed the standards." Thus, where OSHA adopts a standard that includes mandatory medical monitoring, this state must do the same. In the absence of an OSHA rule, it appears that such monitoring is required only "where appropriate,"a standard obviously relegated to agency discretion by the Legislature.
Even accepting the "feasibility" standard applied by the majority does not, however, lead to the majority's result. Despite nearly identical language in the federal Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. § 655(b)(5), (7), federal courts have not concluded that every feasible safety or health standard must be adopted. Instead, the courts have recognized that the agency must have discretion to decide the means for carrying out the statutory mandate, discretion to determine priorities for rule making, and discretion as to the speed with which the agency considers a problem. See Bldg. & Constr. Trades Dep't v. Brock, 838 F.2d 1258, 1271 (D.C.Cir.1988) (the feasibility principle may not be applied in a way which would deprive OSHA of the almost unlimited discretion to devise means to achieve the goal mandated by Congress; nor is there any requirement that every possible tightening of a regulation must be made); Am. Iron & Steel Inst. v. OSHA, 182 F.3d 1261, 1269 (11th Cir.1999) (OSHA's choice to limit rule making by excluding certain policy pertaining to atmospheric contamination from consideration, regardless of feasibility, found to be a valid exercise of the agency's authority to set priorities); AFL CIO v. OSHA, 965 F.2d 962, 985 (11th Cir.1992) (OSHA's decision to defer issuing standards on permissible exposure limits to air contaminants within discretion of agency to set priorities for the use of the agency's resources, and to promulgate standards sequentially). Moreover, as the United States Supreme Court has observed, the allocation of funds from a lump-sum appropriation is a discretionary administrative decision, given that such an appropriation is designed to allow the agency to adapt to changing circumstances and meet statutory duties in the way it sees as most effective or desirable. Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). This court has also recognized that problems of priority setting and resource allocation may result in agency inaction, and that accordingly in such cases a court should proceed with great caution, as these are valid reasons for concluding that the agency has not acted arbitrarily or capriciously, even in the face of a statutory duty. Hillis, 131 Wash.2d at 393-94, 932 P.2d 139.
Under the arbitrary and capricious standard, the Director's actionthe decision not to promulgate a mandatory rulewas not arbitrary and capricious. First, as Dr. Michael Silverstein, the Assistant Director for the WISHA Services Division, testified, and as the majority acknowledges, the Department is restricted by limited resources, in terms of both budget and staff. Silverstein explained that any new rule making project would either require additional funding, or the displacement of other agency activities. He also pointed out that "[t]here are literally hundreds of such chemicals to which millions of workers are exposed." Clerk's Papers (CP) at 497. He explained that pesticide rule making would be procedurally complex, and would require extensive use of limited professional staff and a fixed budget. He said other agency work would not be done, and, significantly, other workers would not be protected. Silverstein noted the limited options available, should the Department focus on pesticide protection. The Department could, for example, forgo rule making to protect workers from musculoskeletal disorders, which are the cause of more than half of the workplace injuries in the state, or forgo further rule making concerning hundreds of chemicals causing workplace asthma, or reduce workplace inspections and consultations.
Dr. Silverstein also noted that nearly all of the work of the rule making section of his division involves nondiscretionary tasks: (1) *980 the statutory requirement to promulgate and enforce rules at least as effective as those of OSHA; (2) rule making specifically required by the Legislature; (3) and rule making activities under the Governor's Executive Order on Regulatory Improvement. The Assistant Director did not foreclose future rule making on cholinesterase monitoring, however. He specifically noted the possibility of future consideration of a mandatory rule.
In short, these reasons offered by the department for not promulgating a mandatory rule are precisely those that this court, and the federal courts, have recognized as valid justifications for not taking action, i.e., limited resources and priority setting.
In addition, where there are "hundreds of such chemicals," I cannot fathom how the majority can conclude that the decision not to require mandatory testing with respect to one is arbitrary and capricious. It is also important to remember that OSHA has not promulgated any cholinesterase monitoring rules, nor has any labor department in any stateCalifornia's monitoring is required by the state's agriculture rules. More importantly, it also must be remembered that there are many rules that actually have been promulgated in this state that are designed to protect the pesticide workers from pesticide contamination in the first place. If the rules adopted in Washington are followed, as is required by law, exposure to pesticides will be reduced or eliminated. The Director has not failed to promulgate rules to protect pesticide handlers, and this court should defer to his decision as to the means of regulation. Given the protections afforded, the failure to additionally monitor blood for pesticide exposure, under all the facts and circumstances in this case, can hardly be said to be arbitrary and capricious.
The majority says, however, that the agency had already made cholinesterase monitoring a priority, had invested its resources in studying cholinesterase-inhibiting pesticides, and its own team of technical experts had deemed a monitoring program both necessary and doable. Given this "extraordinary circumstance," the majority says, the agency's refusal to adopt a mandatory rule was arbitrary and capricious.
The danger in this holding is that anytime an agency embarks on an investigation whether to engage in rule making, on its own initiative or by petition, and obtains any information which will guide its determination whether to engage in rule making, it could then be required to engage in rule making because it has already made studying the issue a priority and has invested its resources. Also, to say this case involves an "extraordinary circumstance" is to say that a great number of routine agency studies will constitute "extraordinary circumstances" warranting this court's intervention in the administrative process.[3]
*981 Here, the agency considered rule making when the pesticide handlers originally petitioned for rule making. After considerable effort, and adoption of numerous rules for protecting pesticide handlers, the Department declined to adopt a mandatory blood monitoring rule. The Department did not completely drop the matter, however, but arranged for a team of experts to identify what would be required for a successful monitoring program. In 1995, the Technical Advisory Group (TAG) issued a report that recommended a nonmandatory program, particularly because there were limitations of various resources vital to implementation of recommendations made in the report. (Not only was the recommendation for a non mandatory rule, there is nothing that indicates that the TAG report constituted an agency determination about rule making.)
Moreover, despite the majority's implication that the agency has all but adopted a rule, the reality is far from it. As Dr. Silverstein explained, rule making requires a formal analysis of alternatives to rule making and consideration of consequences of not adopting a rule; a cost-benefit analysis, which would be technically difficult where a cholinesterase blood testing rule is concerned; and a determination that the rule adopted is the least burdensome. He explained that the Department has had no experience in adopting rules for medical monitoring because all previous medical monitoring requirements that have been adopted are identical to OSHA rules based upon OSHA regulatory analyses. He explained there are no two sets of medical monitoring rules that are the same, and no template to follow. (As mentioned, the federal agency does not monitor cholinesterase levels in pesticide handlers' blood, and no state in the nation had adopted such a requirement, with the exception of California, and that adoption was not by a labor agency.)
Thus, as Dr. Silverstein noted, the Department would have to address various options including eligibility of workers, frequency of tests, qualifications of testers, recordkeeping requirements, laboratory quality control, medical removal testing, medical confidentiality, and resolution of disputes among providers. These options would have to be considered even in light of existence of this state's recommended program under WAC 296-307-14520 and California's existing program, because, as the TAG report indicated, these programs are lacking in several respects. The report noted needs for standardization of laboratory testing methods, accreditation of participating medical supervisors, expansion of workers covered, development of guidelines for follow-up monitoring, and modification of baseline measurement criteria. Dr. Silverstein explained that the agency's experience has been that safety and health regulation in the agricultural sector has been controversial and contentious, and anticipated this would be true for a medical monitoring rule. Thus, to adequately prepare, additional technical and legal resources would be required to develop and evaluate what would be a voluminous record.
Dr. Silverstein noted that it is not unusual for an OSHA rule of this complexity to require 10 to 15 years from start to finish, and thus the Department does not undertake lightly to engage in rule making for which there is no OSHA standard. Finally, Dr. Silverstein identified a number of technical problems associated with cholinesterase testing.
In light of the heavy demands upon the Department's limited resources, the wide range of other areas of worker protection that call for attention, the fact that there are numerous rules that have actually been promulgated *982 to protect pesticide workers from exposure in the first place, the absence of any comparable rule in the federal system or 48 of the other states, and the complexity of the rule making required, including factual complexity, it cannot be said that the Director's decision was arbitrary or capricious. Allocation of resources and the setting of priorities are decisions which must lie within the agency's discretion, and decisions respecting use of those resources and the setting of priorities are decisions to which this court should apply a particularly deferential arbitrary and capricious standard where the failure to adopt a rule is concerned.
Finally, the role of adequate funding cannot be overlooked. As this court said in Hillis:
The judiciary is the branch of government that is empowered to interpret statutes, not enact them. While there are special situations when the courts can and should order the expenditure of funds, specific appropriation to fund a statutory right, not involving constitutional rights or judicial functions, is normally beyond our powers to order. If every time we decided that the Legislature had not appropriated enough funds to an agency for a given purpose we could rule that the agency was "arbitrary or capricious" for failing to act and order the agency to act, then the funding of all agency action would be effectively shifted from the Legislature to the courts.
Hillis, 131 Wash.2d at 390, 932 P.2d 139.
I would hold that the Director's 1997 decision not to adopt a mandatory cholinesterase testing rule was not arbitrary or capricious.[4]

III.

1993 Recommendation for Testing
Finally, the majority holds that the Director did not act arbitrarily in refusing to enact a mandatory rule in 1993. Although I agree with the result, I do not agree that this issue involves a deficiency in the rules that were enacted and thus do not agree with the majority's analysis. Contrary to the majority's conclusion, there was no rule making in 1993 that is reviewable under RCW 34.05.570(2)(b). The nonmandatory recommendations for blood testing, see WAC 296-307-14520, did not comprise a rule, as the majority implicitly acknowledges. See RCW 34.05.010(16).[5] The majority says, though, that the failure to adopt a mandatory rule in 1993 was a deficiency in the rules that were enacted, and thus subject to review under RCW 34.05.570(2)(b). Majority at 965 n. 3. This analysis means that an agency's decision to delay or deny rule making with regard to virtually any subject the agency considers in connection with the rules it actually adopts will be reviewable as rule making. This broad expansion of appellate review is unwarranted.
The case the majority cites, Consumers Union of U.S., Inc. v. Federal Trade Commission, 801 F.2d 417, 422 (D.C.Cir.1986), does not support the majority's conclusion. In that case, the Federal Trade Commission promulgated a "Used Car Rule" requiring dealers to post several consumer warnings, the terms of any warranty, and a list of known specific mechanical defects on a standard window sticker. Before the rule was final, see id. at 423, it was revised to delete the known-defects provision. When the rule was challenged on appeal because it did not include this provision, the Commission argued that the gravamen of the appeal was the failure to engage in rule making. The court disagreed, and said that the case involved an issue of the rationality of the rule that was adopted, given the alternatives that were suggested and rejected. Id. at 422.[6]
*983 Here, in contrast, the Director promulgated a series of rules to protect agricultural workers from pesticides, including, as the majority notes, at page 971 (quoting CP at 515), "`personal protective clothing, respiratory protection, gloves, training, posting, first aid, emergency facilities, washing facilities, eye-wash requirements, and other provisions designed to protect workers.'" These rules concern preventive practices, warnings, and emergency practices when contamination occurs, but do not concern medical blood monitoring to determine pesticide exposure. While in Consumers Union the rule challenged, including the omitted provision, directly related to consumer information to be provided in a window sticker on used cars, here none of the rules actually promulgated by the Director in this case can be said to have omitted a naturally related provision concerning medical blood monitoring. Unlike the case in Consumers Union, the gravamen of the pesticide handlers' challenge with regard to 1993 is the failure to promulgate a mandatory rule for blood testing, i.e., the failure to engage in rule making.
The majority's equation of the failure to adopt a rule to a rule significantly alters appellate review and fails to accord the considerable deference that applies to an agency's decision not to adopt a rule.
Lastly, the pesticide handlers argued to the Court of Appeals that their petition for rule making in 1991 satisfies the requirement under RCW 34.05.330(1) for a petition to adopt a rule. That petition led to a number of rules, as noted, but did not result in a rule regarding testing blood for cholinesterase levels. The 1993 action on that petition did not result in a rule, but rather resulted in the refusal to adopt a rule. The 1991 petition does not satisfy RCW 34.05.330(1) with regard to the 1997 decision.
I would reverse the Court of Appeals.
SANDERS, J. (dissenting).

Once the ... well has been poisoned, we all must drink from it lest the incentive to correct our mistakes in a principled fashion be lost by inconsistently imposing them.[[1]]
Yet another governmental agency claims it is unable to carry out its statutory duties because of inadequate financial ability. The situation is on all fours with the one we faced in Hillis v. State, Department of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997) where the Department of Ecology (Department) acknowledged it had a statutory duty to process water permit applications but complained it did not have the resources necessary to process them in a timely manner, if at all. Id. at 378, 387, 932 P.2d 139. This court, however, excused the Department's violation of the applicants' legal rights based on its asserted "governmental poverty."
There the dissent complained, in vain, that the court's decision allowed agencies to operate outside, rather than under, the law. However, that was the dissent. Now it must be acknowledged the court's holding in Hillis and the Department's claim in this case are without distinction.
If our current majority will not overrule Hillis, it must apply it. The luxury of applying one rule to one party and a different rule to another party is a luxury the rule of law can ill afford. We must guard against impoverishment of principle even more diligently than the executive is concerned about impoverishment *984 of the public fisc. Since Hillis holds lack of financial resources excuses governmental violations of legal rights, the Department's failure to provide the pesticide handlers the protection they are allegedly guaranteed by statute must be condoned for the same reason. See RCW 49.17.010, .050(4),.240(2).
I therefore dissent.
NOTES
[1] The pesticides' interference with cholinesterase causes an accumulation of the chemical acetylcholine in the synapses between nerves and muscles, glands, and other nerves; the acetylcholine thus "continues to stimulate or overstimulate the effector organs, and we get the manifestations of toxicity." Clerk's Papers (CP) at 2114-15. Overexposure to such pesticides can be fatal. The common symptoms of overexposure include headaches, sweating, weakness, diarrhea, vomiting, increased salivation, respiratory distress, repetitive muscle contractions, blurred vision, cognitive difficulties, seizures, and loss of consciousness. Long-term effects may include "delayed peripheral neuropathy,... a dying back of the nerves in the body as a result of the toxicity of the pesticide," as well as impairment of "relatively basic neurological function." Id. at 2115, 2119.
[2] "(1) We recommend that you implement a screening program for cholinesterase monitoring for employees handling organophosphate and carbamate pesticides.

"(2) Red blood cell and plasma cholinesterase testing of employees who handle toxicity class 1 or 2 carbamate or organophosphate pesticides is an acceptable bioassay method for determining the extent and effects of exposure to these types of pesticides. The schedule of testing should include a preexposure baseline level, followed by periodic monitoring during the period of exposure.
"(3) You should provide baseline cholinesterase tests for all employees handling carbamate or organophosphate pesticides for 30 hours or more in any 30 day period.
"(4) Employees should be given baseline tests before actual exposure, at the beginning of the growing season, or upon first hire. These baseline tests should be repeated every two years.
"(5) Periodic tests should be conducted every 30 days after the initial baseline for the next three months, and every 60 days thereafter until organophosphate or carbamate pesticide exposure ceases.
"(6) You should not allow a monitored employee to be further exposed to carbamate or organophosphate pesticides if any cholinesterase test in comparison to the baseline is less than 70% of red blood cell baseline levels or 60% of plasma baseline levels. These employees should not be further exposed to organophosphate pesticides until their cholinesterase levels return to 80% or more of their baseline levels.
"(7) Employees should be monitored for plasma or red blood cell cholinesterase levels.
"(8) Monitoring programs should include appropriate follow-up and referrals to health care providers as needed, and should include a mechanism for recordkeeping and report tracking."
WAC 296-307-14520.
[3] We agree with the conclusion of the Court of Appeals that, because the Department's decision to make cholinesterase monitoring nonmandatory was closely related to the rules promulgated in 1993, the decision not to include a mandatory cholinesterase program is reviewable as a deficiency in the rules. Rios v. Dep't of Labor & Indus., 103 Wash.App. 126, 132-33, 5 P.3d 19 (2000) (citing Consumers Union of U.S., Inc. v. F.T.C., 801 F.2d 417, 422 (D.C.Cir.1986)). Thus, by "the 1993 rule" under review, we mean the 1993 pesticide regulations, chapter 296-307 WAC, Parts I J, which did not include a mandatory cholinesterase program. Id. at 133, 5 P.3d 19.
[4] RCW 49.17.010. Article II, section 35, of the Washington State Constitution provides that "[t]he legislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health."
[5] RCW 49.17.050(4). Cf. 29 U.S.C. § 655(b)(5), (7): "The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life.... Where appropriate, such standard shall also prescribe suitable protective equipment, and control or technological procedures to be used in connection with such hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be necessary for the protection of employees." (Emphasis added.)
[6] RCW 49.17.050(4). WISHA further mandates that, "[w] here appropriate, such [safety and health standards] ... shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be reasonably necessary for the protection of employees," and that, "[i]n addition, where appropriate, any such rule shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure." RCW 49.17.240(2) (emphasis added). Cf. 29 U.S.C. § 655(b)(7): "Where appropriate, such standard... shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be necessary for the protection of employees. In addition, where appropriate, any such standard shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure." (Emphasis added.)
[7] RCW 49.17.020(7) (emphasis added). Cf. 29 U.S.C. § 652(8): "The term `occupational safety and health standard' means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." (Emphasis added.)
[8] This distinction-between weighing the economic feasibility of a proposed standard and prioritizing rulemaking due to budgetary constraints-is perhaps somewhat clearer under OSHA because the federal statute includes a specific provision acknowledging that the secretary will necessarily have to set priorities. See 29 U.S.C. § 655(g) ("Priority for establishment of standards"). Although § 655(g) was not included among the WISHA provisions, the indisputable reality is that the Department's finite fiscal resources require the director to exercise discretion in prioritizing among potential rulemaking initiatives.
[9] "Although the practical effect of the [ATMI] decision was the elimination of cost-benefit analysis as a tool of judicial review, the doctrine of cost effectiveness was not abolished. Cost-benefit analysis determines whether the social benefits of the regulation outweigh the costs to the industry of imposing it and, therefore, whether standards ought to be imposed at all. On the other hand, cost effectiveness merely compels the choice of a less costly alternative in the case where there are multiple methods of effectively reducing the significant risk." David R. Cherrington, Comment, The Race to the Courthouse: Conflicting Views Toward the Judicial Review of OSHA Standards, 1994 B.Y.U.L.REV. 95, 111 (1994) (footnote omitted).
[10] "Before adopting a rule ..., an agency shall... [d]etermine that the probable benefits of the rule are greater than its probable costs, taking into account both the qualitative and quantitative benefits and costs and the specific directives of the statute being implemented." RCW 34.05.328(1)(c).
[11] RCW 34.05.570(2)(c). Where the Department assesses the feasibility of a toxic agent standard arbitrarily and capriciously, it thereby violates the mandatory language of RCW 49.17.050(4) ("shall set a standard which most adequately assures, to the extent feasible"). The resulting rule would arguably meet another basis for judicial review ("exceed[ing] the statutory authority of the agency"). RCW 34.05.570(2)(c).
[12] Aviation W. Corp., 138 Wash.2d at 432, 980 P.2d 701 (quoting and adding emphasis to Neah Bay Chamber of Commerce v. Dep't of Fisheries, 119 Wash.2d 464, 474, 832 P.2d 1310 (1992)). Prior to the 1995 amendment to RCW 34.05.570(2)(c), a reviewing court could invalidate a rule upon finding that the rule "could not conceivably have been the product of a rational decision-maker." Laws of 1995, ch. 403, § 802(2)(c). The Neah Bay court observed that this standard "involve[d] an inquiry into the reasonableness of regulations analogous to the application of the arbitrary and capricious standard." 119 Wash.2d at 473, 832 P.2d 1310; see also William R. Andersen, The 1988 Washington Administrative Procedure Act-An Introduction, 64 WASH. L.REV. 781, 835 (1989) (expressing doubt "that a judge can distinguish [the rational decision-maker standard] from the arbitrary and capricious standard"). Indeed, the 1995 amendment substituted the arbitrary and capricious standard. That standard is consistent with the APA provision that, "[i]n reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency." RCW 34.05.574(1). And we have registered agreement with Professor Andersen's opinion that "substantial judicial deference" should be accorded "when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise." Andersen, supra, at 832, cited in Hillis, 131 Wash.2d at 396, 932 P.2d 139.
[13] CP at 516. Whether Cant was referring to additional costs to the employers, a permissible consideration in the feasibility analysis, or to the Department's resources is unclear.
[14] It appears that California did not have in place in 1985 a package of protections comparable to Washington's 1993 regulations. Although California had "closed systems for mixing and loading Category I pesticides," CP at 2180, "[w]orkers handling cholinesterase-inhibiting chemicals in closed mixing and loading systems exclusively [were] not subject to routine cholinesterase monitoring, and the time spent using only closed mixing and loading apparatus [was] excluded from the hours which trigger routine cholinesterase monitoring." Richard G. Ames et al., Protecting Agricultural Applicators from Over Exposure to Cholinesterase Inhibiting Pesticides: Perspectives from the California Programme, 39 J. SOC. OCCUP. MED. 85, 88 (1989). Thus, the 1985 Ames study apparently did not measure the benefits of the closed system, California's most important protective measure.
[15] RCW 34.05.570(4)(c)(iii). If our review reveals that the Department's 1997 decision was "arbitrary or capricious," then the Department's denial of the pesticide handlers' request will have contravened the mandatory language of WISHA and will have provided another basis for relief under the APA's judicial review statute as an action "[o]utside the statutory authority of the agency or the authority conferred by a provision of law." RCW 34.05.570(4)(c)(ii).
[16] CP at 272. That the TAG recommended in its September 1995 cover letter a nonmandatory program rather than a mandatory one requires some qualification. The TAG deferred to the Department's financial straits and attributed the group's endorsement of a nonmandatory program to "the current limitations of various resources vital for the implementation of some of the recommendations described in this document." CP at 202.
[1] The word "may" means petitioning is permissive in that a person is not required to petition for rule making. However, it does not mean that if rule making is sought, a petition is optional. RCW 34.05.330(1) is the only avenue in the state Administrative Procedure Act for "any person" to initiate rule making. Thus, insofar as the Court of Appeals suggested that the use of "may" in RCW 34.05.330(1) means that a petition need not be filed before seeking judicial review of the failure to engage in rule making, it misreads the statute.
[2] Other jurisdictions also refuse to consider the failure to engage in rule making under state provisions which permit "`any person' to submit a petition `requesting the adoption ... of a rule'" (quoting N.C. Admin. Code tit.4 rule 3B.0101) where no such petition was filed, on the basis that "`when the legislature has established an effective administrative remedy, it is exclusive.'" Beneficial N.C., Inc. v. State ex rel. N.C. Banking Comm'n, 126 N.C.App. 117, 123, 484 S.E.2d 808 (1997) (quoting Porter v. Dep't of Ins., 40 N.C.App. 376, 379, 253 S.E.2d 44 (1979)); cf. In re the Application of Hawaiian Elec. Co., 81 Hawai'i 459, 470, 918 P.2d 561 (1996) (court rejects argument that particular matter should have been addressed by rule making, on the ground, among other things, that the appellants failed to petition for the adoption of such a rule as required by statute).
[3] Examples of truly extraordinary cases show how far afield the majority's analysis is. In Public Citizen v. Heckler, 653 F.Supp. 1229 (D.D.C.1986), the Secretary of Health and Human Services declined to promulgate a rule banning the interstate sales of raw milk. She based the decision on the fact that a greater amount of raw milk was marketed and consumed within the producing state, and most illness accordingly occurred there. She concluded the issue was best resolved at the state level. The court found this denial arbitrary and capricious and ordered rule making. The record showed a serious risk of illness resulting from interstate shipments of raw milk, and this risk was not reduced because the amount of milk sold interstate was less than that consumed within the producing state. Id. at 1239. The court also noted that there were formal rule making proceedings in 1973 followed by 12 years of agency information gathering, a public hearing in 1984, and the compilation of a full administrative record. It was undisputed that all types of raw milk are unsafe and pose a significant health risk. Id. at 1240, 1241. As to the agency's explanation, the court noted that the evidence in the record showed that the states had been unsuccessful in individual attempts to regulate the sale of raw milk, that the states did not have authority to prohibit sales of raw milk beyond their borders, and that only the federal government, under its commerce clause power, could institute a nationwide ban. Id. at 1241.

In American Horse Protection Ass'n v. Lyng, 812 F.2d 1 (D.C.Cir.1987), the challenge was to existing regulations relating to "soring" show horses, i.e., deliberately using weighted devices to injure the horses so that their gait would improve. The Secretary of Agriculture declined to revise the regulations after he reviewed studies and other materials relating to devises used to "sore" the horses. Id. at 5. The agency also submitted an affidavit showing fewer findings of violations. Id. The court found the agency's conclusory reasons for refusing to initiate rule making were not the result of reasoned decision-making. The court noted that the agency had noted earlier that the existing regulations, which prohibited use of devices of certain weights, but not devices of lesser weight, were inconsistent with the lawCongress had banned soringand inconsistent with research. Id. at 6. Also, counsel for the agency appeared to resist the proposition that Congress' act was intended to prohibit devices reasonably likely to cause soring. Id. The Court found nothing ambiguous in the federal act banning soring, concluding that it was designed to end the practice. Id. at 6. Further, Congress had amended the act to stop the practice it thought would end with the original act. Id. at 6-7.
These two cases show extraordinary circumstances warranting a court's intervention in the decision not to engage in rule making. The present case is not of the same kind.
[4] Finally, even if rule making is appropriately ordered by this court, the majority has far exceeded its judicial role when it not only directs rule making but directs the precise nature of the rule that must be adopted.
[5] Nor do the recommendations comprise a "safety and health standard" under the Washington Industrial Safety and Health Act (WISHA), since a standard must require the "adoption or use of one or more practices, means, methods, operations, or processes reasonably necessary or appropriate to provide safe or healthful employment and places of employment." RCW 49.17.020(7).
[6] None of the cases cited by the court for this proposition, Consumers Union of U.S., Inc. v. Federal Trade Commission, 801 F.2d 417, 422-23 (D.C.Cir.1986), appears to support the principle stated, and the cases clearly do not support application of that principle in this case. See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (addressing alternatives to the proposed action in an environmental impact statement); Am. Fin. Servs. Ass'n v. Fed. Trade Comm'n, 767 F.2d 957, 988 (D.C.Cir.1985) (determining that agency's decision to reject certain interpretation of the record evidence was not unreasonable; addressing challenge to rule actually promulgated that remedy in rule was too broad and agency should have chosen narrower remedy, and concluding that rule's adoption was not an abuse of discretion because the choice of remedy was reasonable after consideration of alternative remedies and determination that they failed to address the full range of problems involved); Pub. Citizen v. Steed, 733 F.2d 93, 103-04 (D.C.Cir.1984) (involving failure to consider alternatives to suspension of rule relating to tire tread-wear grading).
[1] CLEAN v. City of Spokane, 133 Wash.2d 455, 478, 947 P.2d 1169 (1997) (Sanders, J., concurring). If it is worth saying, it is worth repeating.