**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JUNE 25, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 25, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WASHINGTON FARM BUREAU, | ) | No. 103413-0 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| WASHINGTON TRUCKING | ) | |
| ASSOCIATION, | ) | EN BANC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE | ) | Filed: June 25, 2026 |
| DEPARTMENT OF ECOLOGY, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—When the legislature passed the Washington Climate Commitment Act (CCA), it found that climate change is an existential crisis plaguing our planet and communities. RCW 70A.65.005(1); *Climate Change Impacts*, NAT'L OCEANIC & ATMOSPHERIC ADMIN.[1] As global temperatures rise, we see increasing wildfires, longer-lasting droughts, and severe hurricanes and flooding.

---

[1] https://www.noaa.gov/education/resource-collections/climate/climate-change-impacts [https://perma.cc/T8EV-FS23]

RCW 70A.65.005(1); Courtney Lindwall, *What Are the Effects of Climate Change?*, NAT. RES. DEF. COUNCIL.[2] Greenhouse gas emissions from the burning of fossil fuels increase these negative impacts on environmental and human health. RCW 70A.65.005(1). Absent preventative measures to limit those emissions, the impacts of global warming include the destruction of hundreds of thousands of species, harm to food production, increased diseases, and forced displacement of entire communities. NAT'L OCEANIC & ATMOSPHERIC ADMIN., *supra*.

In an effort to address climate change and reduce greenhouse gas emissions from the largest emitting sources, such as suppliers of fossil fuels, in 2021 the Washington State Legislature enacted the CCA. RCW 70A.65.005, .080(1)(d); LAWS OF 2021, ch. 316.[3] The CCA generally imposes caps on the amount of emissions from fuel suppliers but exempts fuel used exclusively for agricultural purposes from these caps if the fuel buyer provides the seller with an exemption certificate. LAWS OF 2021, ch. 316; former RCW 70A.65.070(1)(a) (2022); RCW 70A.65.020; former RCW 70A.65.080(7)(e)(i) (2022).

The legislature tasked the Department of Ecology (Ecology) with

---

[2] https://www.nrdc.org/stories/what-are-effects-climate-change [https://perma.cc/7Y68-37AE]

[3] If an agency promulgated a rule when a former version of a statute was in effect, the validity of that administrative rule is assessed as of the date of its adoption. *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 905-06, 64 P.3d 606 (2003); RCW 34.05.570(1)(b). Thus, this opinion cites the CCA provisions in effect in 2022, the year the Department of Ecology adopted the rules challenged here.

promulgating a rule to implement the agricultural exemption. Former RCW 70A.65.080(7)(e)(ii). It did so. The Washington Farm Bureau (WFB) filed a petition for rule making, alleging Ecology's rule did not provide a workable method for claiming an agricultural exemption, resulting in fuel overcharges. Ecology denied the petition. WFB then filed a petition for declaratory judgment and for review of agency action in superior court under the Washington Administrative Procedure Act (APA), ch. 34.05 RCW, asserting that Ecology's rule and subsequent denial of the petition for rule making exceeded the agency's statutory authority and constituted arbitrary and capricious action. The court dismissed the petition with prejudice. On direct review, we retained the case.

We affirm. We hold that Ecology's rule largely follows the CCA and did not exceed its statutory authority, and that Ecology's rule and denial of WFB's petition for rule making likewise did not rise to the level of arbitrary and capricious action.

## FACTS AND PROCEDURAL HISTORY

A.     The CCA and Agricultural Fuel Exemptions

The Washington State Legislature passed the CCA in 2021 to address the harmful effects of greenhouse gas emissions on our environment and communities. LAWS OF 2021, chs. 315-317; RCW 70A.65.005.

> The legislature finds that climate change is one of the greatest challenges facing our state and the world today, an existential crisis with major negative impacts on environmental and human health. Washington is experiencing environmental and community impacts

due to climate change through increasingly devastating wildfires, flooding, droughts, rising temperatures and sea levels, and ocean acidification. Greenhouse gas emissions already in the atmosphere will increase impacts for some period of time. Actions to increase resilience of our communities, natural resource lands, and ecosystems can prevent and reduce impacts to communities and our environment and improve their ability to recover.

RCW 70A.65.005(1). The legislature recognized the detrimental repercussions of climate change on our planet and its inhabitants, and the ways in which greenhouse gas emissions exacerbate those impacts, and so the legislature took action to reduce and repair harm at the state level. *Id.* Consequently, the CCA caps and reduces greenhouse gas emissions from Washington's largest emitting sources and industries through a "cap and invest" program. LAWS OF 2021, ch. 316; former RCW 70A.65.070(1)(a); RCW 70A.65.020. In other words, the program sets an emissions limit and lowers the amount of emissions allowances over time to ensure that Washington meets its greenhouse gas reduction commitments. RCW 70A.45.020.

The CCA imposes emissions regulations on "covered entities." Former RCW 70A.65.060 (2021). Covered entities risk being fined if they fail to comply with the prescribed emissions limits. RCW 70A.15.2200(5)(d). Relevant here, suppliers of fossil fuels are covered entities if they emit 25,000 metric tons of carbon dioxide or more per year. RCW 70A.65.080(1)(d).

However, the legislature exempted certain categories of greenhouse gas

emissions from coverage under the cap and invest program. One such exemption applies to emissions from "[m]otor vehicle fuel or special fuel that is used exclusively for agricultural purposes by a farm fuel user" if the "buyer of motor vehicle fuel or special fuel provides the seller with an exemption certificate" as prescribed by Ecology. Former RCW 70A.65.080(7)(e)(i). For purposes of the agricultural exemption, "agricultural purposes" means "the performance of activities directly related to the growing, raising, or producing of agricultural products," but does not include transporting agricultural products and farm equipment on public roads. RCW 82.08.865(2)(a). "Farm fuel user" means "[a] farmer" or "a person who provides horticultural services for farmers." RCW 82.08.865(2)(e). Thus, while the CCA generally caps emissions from fuel suppliers, the agricultural exemption operates to exclude emissions from fuel used for agricultural purposes if the buyer of the fuel provides the seller with an exemption certificate.

The cap and invest program uses a market force structure, meaning the CCA relies on market forces by requiring the largest fuel suppliers in the state to purchase allowances or credits equal to their annual greenhouse gas emissions to comply with emissions limits. *See* RCW 70A.65.010(18)-(19). The exemption certificate framework likewise provides a market-based incentive for suppliers to track and report agricultural exemptions. *See* former RCW 70A.65.080(7)(e)(i). If suppliers

fail to claim those exemptions, the fuel will be more expensive than that of competitors who do claim exemptions on said fuel. The structure of the CCA rests on the presumption that a capitalist market will drive suppliers toward compliance.

B.     Factual Background

The legislature directed Ecology to adopt rules to implement the cap and invest program, and to "determine a method for expanding" this agricultural exemption to include emissions from "fuels used for the purpose of transporting agricultural products on public highways." Former RCW 70A.65.080(7)(e)(ii). Ecology adopted a final rule in 2022, defining "supplier emissions" exempt from emissions regulations as "[m]otor vehicle fuel or special fuel used exclusively for agricultural purposes by a farm fuel user" and "[f]uels used for transporting agricultural products on public highways." WAC 173-446-040(2)(b)(iii)-(iv).

Ecology then became aware that some fuel suppliers had been adding a surcharge to the wholesale price of fuels—even fuel sold to farm users for agricultural purposes—to offset the economic losses from the emissions cap. Ecology responded by publishing interim guidance for fuel exemptions, including information on how to report and document emissions from fuel used for agricultural purposes. As part of that guidance, Ecology explained that fuel suppliers could use a Department of Revenue (DOR) form as the exemption certificate to prove fuel

sales fall under the agricultural exemptions. *See* former RCW 70A.65.080(7)(e)(i). The certificate provides that "[t]his form may be utilized to document fuel transactions that are exempt under these provisions, but fuel users and covered entities are not required to use it." Clerk's Papers (CP) at 599.

C.      Procedural History

WFB then filed a petition for rule making, asking that Ecology open rule making to establish a more workable method to claim an agricultural exemption under the CCA before purchasing fuel as well as a process for those in the agricultural industry to receive refunds for surcharges on fuel. Ecology formed a work group to address the issue and noted it would be nearly impossible to "create a paper-trail of receipts showing that fuel produced was end-used for [agricultural] purposes." *Id.* at 247. Ecology also determined that accurate exemption of emissions is a matter of compliance enforcement as opposed to implementation.

Ecology denied WFB's petition for rule making. Ecology reasoned that the interim guidance it previously issued assisted fuel suppliers in documenting sales of exempt fuel and in avoiding surcharges on that fuel. Ecology also explained that since the guidance was being implemented successfully by many fuel suppliers, it was unnecessary to change the current rules. Moreover, Ecology stated that it lacked authority to allocate refunds for fuel surcharges and that WFB did not identify

any mandatory duty for Ecology to do so.

In superior court, WFB filed a petition for declaratory judgment and for review of agency action under the APA. WFB requested that the court declare invalid chapter 173-446 WAC because Ecology's rule implementing the agricultural fuel exemption failed to create a workable mechanism to receive CCA exemptions, which imposed a large financial burden on those in the agricultural and trucking sectors. WFB argued that Ecology exceeded its statutory authority and acted in an arbitrary and capricious manner by implementing a rule that was contrary to the CCA, and that Ecology wrongly denied WFB's petition for rule making, which could have presented an opportunity to fix the original rule.

The superior court dismissed WFB's action with prejudice. WFB sought this court's direct review, and we retained the case.

ANALYSIS

Under Washington's APA, a rule promulgated by an agency is valid unless it is unconstitutional, exceeds the statutory authority of the agency, was adopted without compliance with statutory rule-making procedures, or is arbitrary and capricious. RCW 34.05.570(2)(c). Other agency actions are reviewed for similar considerations, including whether the action exceeds the agency's statutory authority or is arbitrary and capricious. RCW 34.05.570(4)(c). The party challenging an agency action bears the burden to demonstrate

8

its invalidity. RCW 34.05.570(1)(a). Additionally, relief will be granted only if the invalid action substantially prejudiced the party seeking to invalidate it. RCW 34.05.570(1)(d).

A.     Statutory Authority

WFB argues that Ecology exceeded its statutory authority by adopting a rule applying the CCA's agricultural exemption exclusively to suppliers rather than farm fuel users, which allows suppliers to impose surcharges. Ecology agrees that its rule places the point of regulation on fuel suppliers, not farm fuel users, but asserts that the rule is consistent with the plain language and statutory framework of the CCA and is therefore within its statutory authority. We agree and hold that Ecology did not exceed its statutory authority.

Administrative rules are presumptively valid. *Spokane County v. Dep't of Fish & Wildlife*, 192 Wn.2d 453, 457, 430 P.3d 655 (2018); *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 378, 216 P.3d 1061 (2009). Agency rules are invalid where they are "inconsistent" with the statutes they implement. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 715, 153 P.3d 846 (2007). But where a rule is "reasonably consistent" with the underlying statute, the rule should be upheld. *Id.*; *Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 892, 83 P.3d 999 (2004). WFB bears the burden of demonstrating the invalidity of Ecology's action and

must show "compelling reasons" why the rule conflicts with the intent and purpose of the legislation. *See* RCW 34.05.570(1)(a); *see also Weyerhaeuser Co. v. Dep't of Ecology*, 86 Wn.2d 310, 317, 545 P.2d 5 (1976).

To determine whether a rule is consistent with a statute, we must engage in statutory interpretation, where our "objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002); *Dep't of Fish & Wildlife*, 192 Wn.2d at 457. Statutory interpretation is a question of law we review de novo. *Campbell & Gwinn*, 146 Wn.2d at 9. We discern the plain meaning by considering the language of the statute and related statutes. *Id.* at 10-11. It is well established that "'[t]he drafters of legislation . . . are presumed to have used no superfluous words and we must accord meaning, if possible, to every word in a statute.'" *In re Recall of Pearsall-Stipek*, 141 Wn.2d 756, 767, 10 P.3d 1034 (2000) (alterations in original) (quoting *Greenwood v. Dep't of Motor Vehicles*, 13 Wn. App. 624, 628, 536 P.2d 644 (1975)).

WFB argues that in promulgating the cap and invest rule in chapter 173-446 WAC, Ecology exceeded its authority under the CCA, former RCW 70A.65.080 (2022), because Ecology failed to create a system exempting farm fuel users from paying surcharges when purchasing fuel for agricultural purposes. Specifically, WFB claims that the CCA's agricultural fuel exemption applies to end users of fuel, not suppliers. In other words, WFB asserts

that the plain language and structure of the CCA demonstrates that the legislature intended to exempt farmers—the end users of agricultural fuel—from increased fuel costs.

In support of this assertion, WFB emphasizes that the CCA states that Ecology must maintain the agricultural exemption "in order to provide the *agricultural sector* with a feasible transition period" and places the decision of whether to seek the exemption on agricultural users by providing that the "exemption is available *only if a buyer* of motor vehicle fuel or special fuel provides the seller with an exemption certificate." Former RCW 70A.65.080(7)(e)(i)-(ii) (emphasis added). WFB argues further that the user-focused purpose of the exemption is reinforced by the CCA's reference to RCW 82.08.865, which exempts farm fuel *users* from business and operation taxes as well as sales for agricultural purposes. Thus, WFB would have us conclude that the legislative intent is that those in the agricultural sector be absolved of the costs associated with the cap and invest program; if we so concluded, WFB contends we would have to find that Ecology's regulations are inconsistent with the plain statutory meaning of the CCA.

We decline to adopt WFB's position because the plain language of the CCA places the point of regulation on *fuel suppliers, not end users*. The CCA generally restricts fuel suppliers from selling more than a certain allowance of fuel unless they have an exemption certificate from the buyer showing that the fuel is going to be

11

used exclusively for agricultural purposes by a farm fuel user. RCW 70A.65.080(1)(d); former 70A.65.080(7)(e)(i). The CCA imposes compliance obligations on covered entities, including large "*supplier*[*s*] of fossil fuel." RCW 70A.65.080(1)(d) (emphasis added). The CCA indicates that *fuel suppliers* are permitted to exceed the emissions cap if the *supplier* can demonstrate that the excess emissions were used exclusively for agricultural and related transportation purposes. *Id.*; former RCW 70A.65.080(7)(e)(i)-(ii); *see also Campbell & Gwinn*, 146 Wn.2d at 11. As fuel suppliers are the covered entities regulated by the CCA, fuel suppliers (not end users) are the entities that can claim agricultural exemptions for fuel used for agricultural purposes. RCW 70A.65.080(1)(d); former RCW 70A.65.080(7).

While agricultural fuel users benefit from this exemption, the CCA does not directly regulate those end users. Although the CCA predicates a supplier's *eligibility* to claim agricultural exemptions on the ultimate end-use of the fuel, *the exemptions* expressly apply to supplier "*emissions* [that] are exempt from coverage in the program," not end users. Former RCW 70A.65.080(7)(e)(i)-(ii) (emphasis added).

WFB's argument about the CCA's reference to RCW 82.08.865 is similarly misplaced. Former RCW 70A.65.080(7)(e)(i) defines "agricultural purposes" and "farm fuel user" as having the same meanings as provided in RCW 82.08.865, which defines those terms for purposes of a tax exemption. But the

definition of those terms does not modify the definition of "covered entities"—which includes *suppliers, not fuel users*—or the general language of the agricultural exemption that applies to the fuel itself.

WFB has not met its burden to show "compelling reasons" why Ecology's rule conflicts with the intent and purpose of the CCA's agricultural exemption. RCW 34.05.570; *Weyerhaeuser*, 86 Wn.2d at 317. Instead, Ecology's rule is "reasonably consistent" with the CCA and therefore is a valid rule that does not exceed the scope of the agency's statutory authority. *Bostain*, 159 Wn.2d at 715; *Campbell*, 150 Wn.2d at 892. The chart below is a side-by-side demonstration of the relevant CCA provisions setting out the agricultural exemption (left) and the rule promulgated by Ecology to carry out the statutory purpose (right). *See* RCW 70A.65.220 (tasking Ecology with adopting rules to implement the provisions of the CCA).

| CCA's Agricultural Exemption<br>*Former RCW 70A.65.080(7)(e)(i)-(ii)* | Ecology's Rule<br>*WAC 173-446-040(2)(b)(iii)-(iv)* |
|---|---|
| (7) The following **emissions are exempt from coverage** in the program, regardless of the emissions reported under RCW 70A.15.2200 or provided as required by this chapter:<br>. . . .<br>(e)(i) Motor vehicle fuel or special fuel that is used exclusively for agricultural purposes by a farm fuel user. **This exemption is available only if a buyer of motor vehicle fuel or special fuel provides the seller with an exemption certificate in a form and manner prescribed by the department.** For the purposes of this subsection, "agricultural purposes" and "farm fuel user" have the same meanings as provided in RCW 82.08.865.<br>(ii) *The department must determine a method for expanding the exemption provided under (e)(i) of this subsection to include fuels used for the purpose of transporting agricultural products on public highways. The department must maintain this expanded exemption for a period of five years, in order to provide the agricultural sector with a feasible transition period.* | (2)(b) The following supplier **emissions are not covered** emissions if the supplier can demonstrate to ecology's satisfaction as specified under WAC 173-441-122(5)(d)(xi) that the emissions originate from:<br>. . . .<br>(iii) Motor vehicle fuel or special fuel used exclusively for agricultural purposes by a farm fuel user **as described in WAC 173-441-122(5)(d)(xi)(C).**[4]<br>(iv) *Fuels used for transporting agricultural products on public highways if it meets the requirements in RCW 82.08.865 as described in WAC 173-441-122(5)(d)(xi)(C).*<br>*This exemption is in effect for emissions years 2023 through 2027 and is not available for emissions after 2027.* |

---

[4] WAC 173-441-122(5)(d)(xi) provides:

Owners and operators may separately indicate the quantity of each fuel type if the fuel supplier can demonstrate to ecology's satisfaction that the fuel is used for one of the following purposes:

. . . .

(C) Motor vehicle fuel or special fuel that is used exclusively for agricultural purposes by a farm fuel user. **The supplier must demonstrate to ecology's satisfaction that the buyer of the fuel provided the seller with an exemption certificate as described in RCW 82.08.865.** Fuel used for the purpose of transporting agricultural products on public highways may be included if it is flagged separately and meets the requirements in RCW 82.08.865. For the purposes of (d)(xi) of this subsection, "agricultural purposes" and "farm fuel user" have the same meanings as provided in RCW 82.08.865 and motor vehicle fuel and special fuel have the same meanings as provided in RCW 82.38.020.

(Formatting altered.)

Ecology's rule follows the CCA's agricultural exemption in both form and substance. An agency rule need only be "reasonably consistent" with the statute. *Bostain*, 159 Wn.2d at 715; *Campbell*, 150 Wn.2d at 892. This rule satisfies that standard. The CCA sets out an agricultural exemption to the general mandate for regulations on emissions for large-scale fuel suppliers, and for fuel suppliers to qualify for the exemption, the CCA provides that the fuel must be "used exclusively for agricultural purposes by a farm fuel user," which Ecology expressly reflected in its rule. *Compare* RCW 70A.65.080(1)(d); former RCW 70A.65.080(7)(e)(i)-(ii), *with* WAC 173-446-040(2)(b)(iii). The CCA also requires Ecology to determine a method for expanding the exemption to include fuels used for transporting agricultural products on public highways. Former RCW 70A.65.080(7)(e)(ii). Ecology did just that by promulgating a rule exempting fuels used for that precise purpose, those "used for transporting agricultural products on public highways." WAC 173-446-040(2)(b)(iv).

At its heart, WFB's challenge seems to be a disagreement with the legislature, not with Ecology. WFB's concern is that agricultural fuel buyers are not adequately protected from surcharges on fuel that suppliers are imposing to defray the costs of complying with the CCA. The CCA was not enacted to protect those in the agricultural sector from emissions-related costs but rather to reduce emissions from

large-scale greenhouse gas emitters in an effort to address climate change—to "increase resilience of our communities, natural resource lands, and ecosystems" and to "prevent and reduce impacts to communities and our environment and improve their ability to recover." RCW 70A.65.005(1), .020. The legislature did not grant Ecology the statutory authority to regulate fuel sales in the CCA. Absent this authority, Ecology does not have the power to require fuel suppliers to stop imposing surcharges. RCW 34.05.570(4)(c)(ii) (agency action must not be "[o]utside the statutory authority of the agency or the authority conferred by a provision of law").

In accordance with the CCA, Ecology has determined a method for fuel suppliers to use a DOR form as the exemption certificate to prove fuel sales fall under the agricultural exemptions. *Compare* former RCW 70A.65.080(7)(e)(i), *with* WAC 173-446-040(2)(b)(iii). With the CCA restrictions on fuel sales, fuel suppliers will have to bear certain economic losses, and fuel suppliers have autonomy to decide how to offset those losses, including whether to impose surcharges on all fuel or on only nonexempt fuel. Although WFB takes issue with the imposition of surcharges on those in the agricultural sector, nothing in the CCA precludes fuel suppliers from doing so. This complaint is outside of Ecology's purview; that policy-level decision remains within that of the legislature. *See Rios v. Dep't of Lab. & Indus.*, 145 Wn.2d 483, 510, 39 P.3d 961 (2002) (Alexander, C.J., concurring) (noting agency discretion is limited to terms of the

statutory scheme providing the agency its authority); *see also Campbell & Gwinn*, 146 Wn.2d at 18 n.9 (directing policy issues to the legislature because "[i]t is inappropriate for this court to rewrite statutes"). Ecology carried out the directive of the legislature.

WFB also argues that the CCA's agricultural exemption is mandatory for suppliers, not optional. Consequently, WFB contends that even if this court determines that Ecology lacks authority to provide the benefits of the exemption directly to farm fuel users, we should find that the plain language of the CCA requires the reporting requirement to be mandatory for suppliers. According to WFB, under Ecology's rules, suppliers may, but are not required to, distinguish between farm fuel used for agricultural purposes and fuel used for nonexempt purposes, and the exemption certificate for fuel used for agricultural purposes is meaningless if fuel suppliers impose surcharges to the costs of exempt fuel.

The rule at issue is WAC 173-441-122(5)(d)(xi)(c) (the emissions reporting rule), which provides that for "[m]otor vehicle fuel or special fuel that is used exclusively for agricultural purposes by a farm fuel user," "[t]he supplier must demonstrate to [E]cology's satisfaction that the buyer of the fuel provided the seller with an exemption certificate as described in RCW 82.08.865." RCW 82.08.865(1) indicates that the "exemption is available only if the buyer provides the seller with an exemption certificate in a form and manner prescribed by the department."

17

*See also* former RCW 70A.65.080(7)(e)(i) (same).

The parties disagree as to whether a challenge to that emissions reporting rule is before this court. Ecology argues that since WFB failed to request invalidation of any provision of chapter 173-441 WAC in its petition for review of agency action before the superior court, any arguments regarding WAC 173-441-122 are not properly before us. *See* CP at 6 (petition for declaratory judgment and for review of agency action seeking relief only from "Ecology's adoption of the regulatory framework under *WAC 173-446*" (emphasis added)). WFB contends that it challenged both chapters 173-441 WAC and 173-446 WAC directly to Ecology in its petition for rule making, and the petition for declaratory judgment and review of agency action included that request for relief by reference. *See* CP at 627 (petition for rule making, arguing that "WAC 173-446-040(2)(b) and WAC 173-441-122(5)(d)(xi) create an arbitrary exemption process that is not consistent with [RCW] 70A.65.080(7)(e)(i)-(ii)"), 6 (petition for declaratory judgment and review of agency action "seek[ing] judicial review of Ecology's denial of their petition for rulemaking, as well as Ecology's rules adopted under WAC 173-446"). Although there was a general reference to WFB's petition for rule making (to the agency), since WFB failed to request invalidation of any provision within chapter 173-441 WAC in its petition for review of agency action to the superior court, that rule making file is not included in the agency record; thus, any arguments regarding

18

the validity of WAC 173-441-122 were not before the superior court and are not now properly before us. *See St. Joseph Hosp. & Health Care Ctr. v. Dep't of Health*, 125 Wn.2d 733, 745, 887 P.2d 891 (1995) (declining to decide on the validity of a rule where the rule making file was not part of the record).

Even if WFB had properly raised its attack on the validity of the emissions reporting rule in chapter 173-441 WAC by broadly challenging the regulatory framework of the cap and invest rule in chapter 173-446 WAC, WFB has not demonstrated that any of the rule provisions are "inconsistent" with the CCA. *Bostain*, 159 Wn.2d at 715. Nowhere does the CCA mandate reporting of exempt emissions. WFB argues that the CCA mandates suppliers to report exempt fuel uses because it says *Ecology* "'*must* determine a method for expanding the exemption . . . to include fuels used for the purpose of transporting agricultural products on public highways.'" Opening Br. at 50-51 (alteration in original) (quoting former RCW 70A.65.080(7)(e)(ii)). But *Ecology* is the subject of "must" in that provision, *not* emissions or the reporting of those emissions. That "must" requires only that Ecology expand the exemption to a separate subset of emissions (transporting agricultural products); it does not require that Ecology impose mandatory reporting of exempt emissions. Former RCW 70A.65.080(7)(e)(ii).

The legislature has expressly mandated reporting of certain categories of emissions in other related statutes, such as the Washington Clean Air Act, but

chose not to do so in the CCA. *See* RCW 70A.15.220(5)(a)(i) (providing "the rules *must require* that . . . [e]missions of greenhouse gases resulting from the combustion of fossil fuels be reported separately from emission of greenhouse gases resulting from the combustion of biomass" (emphasis added)); *see also Regence Blueshield v. Off. of Ins. Comm'r*, 131 Wn. App. 639, 650, 128 P.3d 640 (2006*)* (contrasting "may" as permissive language with "shall" as mandatory language). The absence of plain language mandating reporting in the CCA indicates the statute is consistent with Ecology's rule to make reporting optional for suppliers. The legislature has also amended the CCA and continues to consider further amendments, such as removing a five-year limitation on agricultural exemptions and mandating payments to those in the agricultural sector. *See* S.B. 5630, 69th Leg., Reg. Sess. (Wash. 2025). At this juncture, the legislature has not amended the CCA's voluntary exemption reporting framework.[5]

Ecology's rule is reasonably consistent with the CCA's agricultural exemption substantively and structurally. *Compare* WAC 173-446-040(2)(b)(iii)-(iv), *with* former RCW 70A.65.080(7)(e)(i)-(ii). Ecology's rule is reasonably consistent with the plain language of the CCA, which defines fuel suppliers (not end

---

[5] WFB also appears to argue that Ecology acted outside its statutory authority and in an arbitrary and capricious manner by subsequently denying its petition for rule making. We reject that argument because it recycles WFB's former argument that the denial was based on a flawed interpretation that the CCA regulates suppliers rather than end users. WFB's issue here likewise seems to be with the substance of the original rule and does not provide anything new.

users) as the covered entities that can claim agricultural exemptions for fuel used for agricultural purposes. RCW 70A.65.080(1)(d); former RCW 70A.65.080(7)(e); *Bostain*, 159 Wn.2d at 715; *Campbell*, 150 Wn.2d at 892. Likewise, Ecology's voluntary exemption reporting framework is also reasonably consistent with the CCA because the CCA does not require Ecology to impose mandatory reporting of exempt emissions.

We presume Ecology's rules are valid and conclude that WFB did not satisfy its burden of demonstrating "compelling reasons" that Ecology's rules conflict with the intent and purpose of the CCA, which are both aimed at reducing greenhouse gas emissions from the largest emitting suppliers, while providing more flexibility for those in the agricultural sector. *Spokane County*, 192 Wn.2d at 457; RCW 34.05.570(1)(a); *Weyerhaeuser*, 86 Wn.2d at 317. Thus, we hold that Ecology did not exceed its statutory authority.

B.     Arbitrary and Capricious Rule Making

WFB argues that Ecology acted in an arbitrary and capricious manner by first adopting an unworkable agricultural exemption and again by denying WFB's subsequent petition for rule making after being alerted to the pitfalls of the exemption. We reject WFB's arguments and hold that Ecology did not act in an arbitrary and capricious manner.

We must give due deference to the specialized knowledge and expertise

of an administrative agency. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 595, 90 P.3d 659 (2004); *Schneider v. Snyder's Foods, Inc.*, 116 Wn. App. 706, 716, 66 P.3d 640 (2003). The legislature charged Ecology with promulgating a rule to implement the agricultural exemption of the CCA in former RCW 70A.65.080(7)(e)(ii). Thus, "Ecology is in a far better position to judge what is in the public interest regarding" an agricultural exemption to a broader effort to address climate change through greenhouse gas emissions. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997) (courts give "substantial judicial deference" to agencies where factual matters are "close to the heart of the agency's expertise"); *cf. Port of Seattle*, 151 Wn.2d at 612 (finding that because "Ecology is the agency charged with interpreting and applying the water code, its interpretation of a provision deserves deference, so long as that interpretation is not contrary to the plain language of the statute"); *see also About Us*,[6] WASH. STATE DEP'T OF ECOLOGY (stating Ecology's mission is "[t]o protect, preserve, and enhance Washington's environment for current and future generations"); *see also Air & Climate*,[7] WASH. STATE DEP'T OF ECOLOGY (listing "Air & Climate" as one of Ecology's focus areas and stating Ecology "regulate[s] unhealthy emissions from vehicles, burning, and industrial activities to

---

[6] https://ecology.wa.gov/about-us [https://perma.cc/2RPJ-RN8S]
[7] https://ecology.wa.gov/air-climate [https://perma.cc/S6FB-SFPD]

help protect air quality and reduce greenhouse gases that warm the planet").

Although such deference does not extend to rule making that is arbitrary and capricious, WFB bears a heavy burden to show Ecology's actions rise to that level. *Pierce County Sheriff v. Civ. Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983); *Schneider*, 116 Wn. App. at 716. As we have stated repeatedly, rule making is arbitrary and capricious when an agency engages in "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 858, 576 P.2d 888 (1978); *see also Pierce County Sheriff*, 98 Wn.2d at 695; *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980). "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Abbenhaus*, 89 Wn.2d at 858-59; *Lane v. Port of Seattle*, 178 Wn. App. 110, 126, 316 P.3d 1070 (2013). We should not "'undertake to exercise the discretion that the legislature has placed in the agency.'" *Port of Seattle*, 151 Wn.2d at 589 (quoting RCW 34.05.574(1)).

First, WFB argues Ecology acted in an arbitrary and capricious manner by adopting an agricultural exemption framework that is unworkable for those in the agricultural sector. Opening Br. at 56-59. Specifically, WFB asserts that Ecology recognized the difficulties of tracing fuel to an exempt agricultural end use but still

created an exemption program that exempts fuel only if the buyer of the fuel provides the seller with an exemption certificate. *Id.* Simply stated, WFB alleges that Ecology acknowledged the problems with its rule but failed to consider other alternatives, which amounts to "willful and unreasoning'" action. *Id.* at 58-59 (quoting *Puget Sound Harvesters Ass'n v. Dep't of Fish & Wildlife*, 157 Wn. App. 935, 945, 239 P.3d 1140 (2010)). But WFB conflates enforcement of the CCA with Ecology's duty to determine a means for fuel suppliers to claim exemptions. *See Abbenhaus*, 89 Wn.2d at 858; *see also Lane*, 178 Wn. App. at 126. Ecology's acknowledgement of the challenges of promulgating a workable agricultural exemption framework shows quite the opposite of willful, unreasoning action: Ecology engaged in "due consideration" regarding the implementation of the exemption within the confines of the statute. *See Abbenhaus*, 89 Wn.2d at 858-59.

For instance, Ecology recognized that the current exemption framework would make it challenging to "create a paper-trail of receipts showing that fuel produced was end-used for [agricultural] purposes." CP at 247. This challenging accounting issue does not indicate that Ecology disregarded its statutory mandate. Instead, it indicates that Ecology anticipated it would be challenging to prevent incorrect or fraudulent CCA exemption claims. In response, Ecology—consistent with the CCA's mandate—adopted a voluntary exemption reporting system, which incentivizes fuel suppliers to accurately document and report exempt sales. Although

WFB is correct that optional exemption certificates do not ameliorate surcharges on exempt fuel, WFB does not demonstrate this is an unreasonable method for claiming exemptions so as to rise to the level of arbitrary and capricious decision-making. *See Abbenhaus*, 89 Wn.2d at 858-59 (leaving room for more than one opinion and deferring to agency decisions that were made with due consideration).

Additionally, Ecology considered other alternatives and determined they were not feasible. For example, while brainstorming a method for expanding the agricultural exemption to include fuels used for the purpose of transporting agricultural products on public highways, Ecology drafted an implementation plan. The plan included a consultation "with [the Department of Licensing] and DOR to determine a method, and to coordinate on legislative or budget proposals needed to authorize implementation of this exemption." CP at 241. Ecology considered, as an alternative, "the easiest way" to implement the expansion of the agricultural exemption framework, which would be to use "dyed fuel" for agricultural use. *Id.* "Dyed fuel" is diesel fuel with red dye to visually signify that there are no federal or state fuel taxes paid and is often used for farming equipment. *Dyed Diesel*, WASH. STATE DEP'T OF LICENSING.[8] Thus, use of dyed fuel would avoid added costs and ensure easy implementation of the agricultural

___

[8] https://dol.wa.gov/vehicles-and-boats/prorate-and-fuel-tax/fuel-tax/dyed-diesel [https://perma.cc/J5MQ-NNLA]

exemption. But as Ecology noted, "it is currently illegal to drive on a highway using dyed fuel (i.e., for agricultural use)," meaning that method was not "viable." CP at 241; *see also* RCW 82.38.072; WAC 308-77-114. This demonstrates that Ecology thought through alternative regulatory structures and determined none were viable. Ecology's due consideration of alternative methods and the challenges with the current agricultural exemption framework does not rise to the level of arbitrary and capricious action. *See Abbenhaus*, 89 Wn.2d at 858-59.

Second, WFB argues that Ecology's subsequent denial of WFB's petition for rule making was arbitrary and capricious. Opening Br. at 59-64. Specifically, it asserts Ecology "knew that some agricultural fuel users were paying CCA surcharges on exempt fuel" and denied further rule making based on a "flawed interpretation that the CCA only allowed it to regulate suppliers." *Id.* at 61. WFB also argues Ecology did not take significant actions to address the problems raised in the work group regarding regulatory exposure for suppliers who have no way to verify the use of fuel they sell and the imposition of surcharges on farm fuel users. *Id.* at 61-63.

WFB relies on *Rios* as an example of arbitrary and capricious action. 145 Wn.2d 483. At issue in that case was whether the Department of Labor and Industries (L&I) acted in an arbitrary and capricious manner when it adopted a rule recommending but not requiring a blood testing program monitoring cholinesterase

levels for agricultural pesticide handlers. *Id.* at 487-88. The court held that L&I's failure to act constituted arbitrary and capricious action because L&I "had already invested its resources in studying cholinesterase-inhibiting pesticides and because the report of its own team of technical experts had, in light of the most current research, deemed a monitoring program both necessary and doable." *Id.* at 508.

*Rios* is inapposite to our analysis. Unlike in *Rios*, where the work group report found a monitoring program *necessary and feasible before* denying the request for rule making, *id.*, here, Ecology's work group report offered *no consensus* that Ecology's rules and guidance were unworkable, and it was published *after* Ecology denied the petition for rule making. Ecology's decision not to change the rule does not render it arbitrary and capricious because the rule in and of itself is reasonably consistent with the CCA. *Compare* WAC 173-446-040(2)(b)(iii)-(iv), *with* former RCW 70A.65.080(7)(e)(i)-(ii); *see also Bostain*, 159 Wn.2d at 715; *Campbell*, 150 Wn.2d at 892.

Ecology demonstrated its due consideration by providing reasons for its denial of WFB's petition for rule making. Namely, Ecology issued two guidance documents and an exemption certificate form as its selected method for claiming exemptions on fuel used exclusively for agricultural purposes, which has been successfully implemented by fuel suppliers to track and document sales of exempt fuels without assessing surcharges on those fuels. Ecology explained that the

27

successful implementation demonstrates that there was no need for a change to Ecology's rule. Ecology also acknowledged that fuel suppliers imposing surcharges on farm fuel users deprives end users of the benefits of the CCA exemptions, and in response, it established a work group to develop recommendations related to reimbursement. But as Ecology explained, it lacked authority to address this issue through rule making. The legislature did not appropriate funds to be used for the requested refunds, and agencies lack authority to allocate money from the state treasury absent specific statutory authority. WFB's opinion is that the exemption method is impractical, but "there is room for two opinions," and "an action taken after due consideration is not arbitrary and capricious." *Abbenhaus*, 89 Wn.2d at 858-59.

Therefore, WFB failed to demonstrate that Ecology engaged in "willful and unreasoning action" by adopting an agricultural exemption that, while unsatisfactory to WFB, was reasonably consistent with the CCA and was taken with due consideration of the facts and circumstances. *Id.* at 858. WFB likewise failed to meet its burden in arguing that Ecology's denial of WFB's subsequent petition to reopen rule making constituted arbitrary and capricious action when, again, the rule in and of itself was reasonably consistent with the CCA, and Ecology made a reasoned decision to provide guidance on how to claim the exemption under the existing rule and lacked authority to take the specific actions WFB requested. *Bostain*,

159 Wn.2d at 715; *Campbell*, 150 Wn.2d at 892. We give due deference to Ecology's specialized knowledge and expertise and hold that Ecology did not act in an arbitrary and capricious manner. *Schneider*, 116 Wn. App. at 716.

CONCLUSION

The legislature enacted the CCA to limit greenhouse gas emissions in an effort to address the harms of climate change to our environment and communities. Although the legislature exempted fuel used exclusively for agricultural purposes from these emissions limits if the buyer of the fuel provides the seller with an exemption certificate, the supplier-focused statute does not directly provide protections for those in the agricultural sector from emissions-related costs. Ecology promulgated a rule to carry out the expressed statutory purpose of the CCA and otherwise lacks statutory authority to provide refunds to those in the agricultural sector. WFB raises concerns regarding Ecology's method for claiming an agricultural exemption being unworkable, but Ecology is not required to implement WFB's preferred exemption framework; Ecology developed its exemption certificate framework through due consideration, which provides a method for tracking and reporting agricultural exemptions that is currently being utilized by suppliers and is reasonably consistent with the CCA.

We affirm. We hold that Ecology's rule and subsequent denial of WFB's petition for further rule making did not exceed its statutory authority and did not constitute arbitrary and capricious action.

Montoya-Lewis, J.

WE CONCUR:

Stephens, C.J.

Whitener, J.

Johnson, J.

Mungia, J.

González, J.

Madsen, J.P.T.

Gordon McCloud, J.

Yu, J.P.T.

No. 103413-0

González, J. (concurring) — Deru kui wa utareru (出る杭は打たれる).[1]

No justice on this court could do their work without the assistance of

brilliant and hardworking law clerks and other staff.  I have signed the majority

opinion written with the assistance of the author's outstanding law clerk, Bailey

Warrior Pahang.

Justice Montoya-Lewis will leave this court in January 2027 when her term

ends since she has decided not to run for another term.  She has done exemplary

work these past seven years.  Readers of our recent opinions may have noticed that

she has been thanking her staff in her opinions without any problems except for an

---

[1] "Deru kui wa utareru" (出る杭は打たれる) is a Japanese proverb that means "the post that protrudes will be hammered down."  It is often replaced with the malaprop "Deru kugi wa utareru" (出る釘は 打たれる), which means "the nail that protrudes up will be hammered down."  The meanings are quite different in that protruding nails may be dangerous and should be made flush by hammering.  Fences, on the other hand, may benefit from some variations without posing any danger.  Unfortunately, those who are exceptional, outspoken, or challenge conformity face criticism, jealousy, or pressure to conform.  Not all of our traditions are venerable.

*Washington Farm Bureau v. Washington State Dep't of Ecology*, No. 103413-0
(González, J., concurring)

opaque reference to it in the concurrence in *In re Recall of Clouse*, 6 Wn.3d 42, 54,

584 P.3d 386 (2026) (Madsen, J., concurring).

    This time, a majority of this court refused to sign the majority opinion

assigned to her with that expression of gratitude included, so it goes out without it.[2]

    I understand why some justices object to thanking a staff member in an

opinion, and I will continue to take all the credit in my opinions for the work of

this court's extraordinary staff.  But I lament that we are not flexible enough to

support a different cultural tradition.  We should respect that acting within that

---

[2] I respectfully disagree with my concurring colleague.  While justices may assert that they have the right to absolute secrecy in their internal deliberation after an opinion has been issued, no such right exists.  Many justices have donated their papers to libraries.  *See generally* Tony Mauro, *Lifting the Veil: Justice Blackmun's Papers and the Public Perception of the Supreme Court*, 70 Mo. L. Rev. 1037, 1039 (2005) (discussing Justice Blackmun's donated papers); Elizabeth Garrett, *New Voices in Politics: Justice Marshall's Jurisprudence on Law and Politics*, 52 How. L.J. 655, 667 (2009) (discussing Justice Marshall's donated papers).  Many of Justice Utter's working files on cases of significance are at our state archives.  Wash. Sec. of State, Wash. State Archives, Sup. Ct. Just. Papers, Robert Utter; *see also, e.g.*, *Frederick G. Hamley Papers, 1934-1956*, Archives W. ("The Washington Supreme Court subgroup contains opinions, apparently drafted by Hamley before the justices discussed the cases.  Of particular significance are notes Hamley kept on cases heard by the court, 1949-1956.  On printed forms he briefly noted the positions of his fellow judges and himself on each case.  Also included are typed drafts and handwritten notes on some cases."), https://archiveswest.orbiscascade.org/ark:80444/xv16767 [https://perma.cc/D5KF-C866].
    Indeed, opinions of this court have referred to internal proceedings before.  For example, a former chief justice wrote separately to observe in an infamous case that "[t]his case was heard *En Banc* February 26, 1960.  In justice to the writer of the foregoing [majority] opinion, it should be stated that it was not reassigned to him for opinion until September 20, 1960." *Price v. Evergreen Cemetery Co. of Seattle*, 57 Wn.2d 352, 355, 357 P.2d 702 (1960) (separate opinion of Weaver, C.J.), *overruled by Garfield County Transp. Auth. v. State*, 196 Wn.2d 378, 473 P.3d 1205 (2020).

cultural tradition, one of our colleagues has decided to recognize out loud those

who assist us and make us better.

  With these observations, I respectfully concur.


_____
González, J.

_____
Montoya-Lewis, J.

_____
Mungia, J.

No. 103413-0

GORDON McCLOUD, J. (concurring)—The debate in this court over a withdrawn footnote has now delayed the issuance of this opinion for more than a month.

The debate about whether to adopt one particular academic convention for expressing gratitude in published articles, about whether that method of expressing gratitude implicates a particular heritage or value system, and about whether one justice needs to speak up for another justice who is more than capable of speaking up for herself is certainly interesting. But there's another debate going on in this case, and it is also interesting: whether a Department of Ecology rule implementing an aspect of the Climate Commitment Act[1] is lawful. Our main job is to resolve that legal dispute.

When and how to express gratitude, whether and when to elevate transparency, and how best to foster respect for the court are also important. And I welcome the continuation of that discussion elsewhere.

---

[1] Former RCW 70A.65.080(7)(e)(ii) (2022).

But not in the course of debating a withdrawn footnote in an otherwise unanimous decision.

_____
Gordon McCloud, J.

_____
Madsen, J.P.T.

_____
Yu, J.P.T

No. 103413-0

MADSEN, J.* (concurring)—I agree with the majority. However, I write separately to give context to the concurrence by Justice González, which reveals confidential information about the internal actions of the court. Six justices agreed with the following concurrence/dissent before the majority revised:

> I completely agree with the majority opinion, however I decline to join the asterisk located above footnote 1 as it is outside of our appellate record. RAP 9.1(a) (appellate courts consider only the record on review). It is also a practice with which I disagree. I understand the desire to recognize the contributions of dedicated court staff, but "[a] majority opinion is the product of a collegiate court and . . . when filed, it no longer retains any proprietary aspect so far as the drafter is concerned . . . [i]t becomes an institutional product that is owned only by the court." *Engberg v. Meyer*, 820 P.2d 70, 170 (Wyo. 1991) (Thomas, J., dissenting). Similar to the United States Supreme Court, this court "is a collegial institution, and its decisions reflect the views of a majority of the sitting Justices." *Holtzman v. Schlesinger*, 414 U.S. 1304, 1313, 94 S. Ct. 1, 38 L. Ed. 2d 18 (1973).
>
> I do not mean to detract from the work of law clerks, student volunteers, and staff—they are invaluable resources and essential to the work of this court. I write separately because a majority opinion represents

---

* Justice Barbara Madsen is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

the judgment of the court speaking with one voice, not the views or work product of any individual justice or clerk.[1]

At best, attribution to a law clerk in a majority opinion may create confusion and invite questions that are left unanswered in the court's opinion. *E.g., Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) (the practice of attributing credit to a law clerk "may erroneously lead some to believe that the law clerk decided the case"). Law clerks serve vital and instrumental roles; however, it is the justices themselves who make the final determination in cases. In my view, a majority opinion should reflect the judgment of the court as a whole rather than emphasize any one individual's contribution.

Accordingly, I respectfully concur in part and dissent in part.

_____
Madsen, J.P.T.

_____
Yu, J.P.T.

---

[1] In the rare case that explicit acknowledgments of law clerk contributions are made, they are often authored by federal district court judges. *See* Parker B. Potter, Jr., *Judges Gone Wild*, 37 Ohio N.U. L. Rev. 327, 345-360 (2011). In that context, such recognition presents fewer concerns, as a district court judge speaks solely in an individual capacity rather than on behalf of a multimember court, as is the case in the appellate setting.